**HOXIE SCHOOL DISTRICT NO. 46 OF LAWRENCE COUNTY, ARKANSAS, a body corporate under the laws of the State of Arkansas, L. R. Howell, L. L. Cochran, Howard Vance, Guy Floyd and Leo Robert, individually and as Directors of Hoxie School District No. 46 of Lawrence County, Arkansas, and K. E. Vance, Plaintiffs,**

**v.**

**Herbert BREWER; Amis Guthridge, White America, Inc., a corporation organized and operating under the laws of the State of Arkansas, Citizens Committee Representing Segregation in the Hoxie Schools, an unincorporated association, James D. Johnson, Curt Copeland, and White Citizens Council of Arkansas, an unincorporated association, Defendants.**

**No. J-918.**

**United States District Court
E. D. Arkansas, Jonesboro Division.**

**Jan. 9, 1956.**

James Sloan, III, Walnut Ridge, Ark., Edwin E. Dunaway, Little Rock, Ark., Penix & Penix, Jonesboro, Ark., for plaintiffs.

M. V. Moody, Little Rock, Ark., James D. Johnson, Crossett, Ark., for defendants.

REEVES, District Judge.

After the two decisions of the Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98

L.Ed. 873, and 349 U.S. 294, 75 S.Ct. 753, the co-plaintiff, Hoxie School District No. 46 of Lawrence County, Arkansas, through its Board of Directors, L. R. Howell, L. L. Cochran, Howard Vance, Guy Floyd and Leo Robert, seasonably took administrative and executive action to desegregate the races in the school attendance in the public schools of said district. Formal order was made in June, 1955. For economic and other reasons the public schools opened in July, with a plan to interrupt their continuance or sessions for a brief period during crop gathering, or harvesting time, and then to resume their sessions.

The pupils and patrons of the school district agreeably accepted and abided by the action of the Board of Directors in providing for the admission of colored and white children to the study rooms and classes of said schools without discrimination. At that time and previously, according to the undisputed evidence, there had not been provided "separate, but equal" facilities in said district for colored children. The laws of Arkansas required segregation of the races in all public schools of that state.

The Board of Directors, conscious as well as sensitive to the constitutionally imposed obligations of their oaths to support the Constitution of the United States, and, because of the clear and definite doctrine announced in the cases mentioned, felt obliged to admit colored pupils into the public schools attended by white children. Moreover, they were aware, entirely apart from the new doctrine of the law, that there was not and had not been a compliance with the law in the district affording "separate, but equal" facilities to colored children. In addition to this, the expense of segregation was a heavy and costly one, aggregating several thousand dollars, and therefore economic reasons were added to the new as well as to the old requirements of the law, as set forth in the Fourteenth Amendment to the national Constitution.

This action of the Board and the proceedings thereunder were without untoward event or even the cause of friction for a period of approximately three weeks. There were mutterings, however, and expressions of dissatisfaction on the part of a few persons inside and outside the district, and particularly on the part of the named defendants, both as individuals and as representatives of the corporation entitled "White America, Inc.," and named associations through their membership.

This culminated in a mass meeting early in August of 1955 in the city hall of the City of Hoxie, Arkansas. The defendants were present or represented at said meeting. Inflammatory and inciting speeches were made. Petitions were circulated, literature was handed out, and through it all there ran an undercurrent of menace and threat of harm to those responsible for desegregation and for those who might have aided or even approved the act and practice of desegregation of the races.

Among other results that flowed from this mass meeting was the withdrawal of hundreds of white pupils from attendance in the several schools. This decreased the attendance in some rooms as much as sixty percent. The falling off in attendance was occasioned by fear and intimidation from the propaganda of the mass meeting and individual utterances and actions of the defendants after said meeting. The sentiments engendered in the mass meeting by the incitement and stimulus of inflammatory speeches resulted in specific menace to individual members of the school board, including the Superintendent of Schools, K. E. Vance. Other meetings were held at sundry places, both in and out of the district, for discussion of the act of the Board and the practice of desegregation of the races in the Hoxie schools. All of this caused increasing tension and incited individuals among the defendants, and others, to indulge in menacing and covert threats as well as demands for the resignation of the members of the school board. Because of the decline in attendance and other supposed hazards the board, at the request of the Superin-

tendent of Schools ordered a suspension of the sessions. This was done because of the fear of harm and bodily injury that might accrue to the school officials as well as to pupils who might be in attendance at the sessions.

Pursuant to these undisputed facts, the plaintiffs instituted this action, the members of the Board of Directors appearing as plaintiffs both individually and officially as members of the Board. The Superintendent appeared as plaintiff in his own proper person because of threats of bodily harm against him.

In the complaint and prayer for a declaratory judgment substantially the above facts were set forth. The plaintiffs ask for sundry rulings and statutory interpretations, but the prime object was to secure an injunction against the several defendants to prevent their further interference with the operation of the Hoxie schools on a desegregated basis.

At the outset the defendants, through their able counsel, challenged the jurisdiction of the national courts and, when their motion to dismiss was overruled, they filed their answer specifically denying the averments of the complaint and renewing their challenge to the jurisdiction of the national courts.

Upon filing the complaint, supported by affidavits, Judge Trimble granted a temporary restraining order. This was made effective until a hearing could be had on the question of a temporary or interlocutory injunction. When such hearing was had the evidence before Judge Trimble was substantially the same as that above set forth and as that heard in the trial on the merits by the writer. Judge Trimble granted a temporary or interlocutory injunction. The case was then heard by the writer on the question of a permanent or perpetual injunction.

Other facts, if they may become pertinent, will be stated in the course of this memorandum opinion.

■ 1. The defendants renewed their challenge to the jurisdiction of the court in the amended answer filed by them. Since the evidence before Judge Trimble was substantially the same as that before the writer, the ruling of Judge Trimble as to the jurisdiction of the court has become the law of the case and is binding upon all other judges or any judge who might preside in the trial of the issues on final hearing.

■■ 2. It may seem proper, however, to supplement and repeat the reasoning as well as the authorities upholding the jurisdiction of the court.

In the first place, in the several cases of Brown v. Board of Education of Topeka, supra, the Supreme Court not only nullified, in effect, the segregation laws of the State of Arkansas, but it specifically retained jurisdiction in the national courts to make effective the provisions of the Fourteenth Amendment as it became pertinent in the cases. In practical effect the Court retained jurisdiction, not only in the cases before the Court (being class actions) but in all similar cases, to the end that the decision of the Supreme Court might be fully implemented. This, of course, follows the well-known maxim that equity will do justice, and not by halves. It is to be noted, among other things, that members of the Board of Directors with Professor Vance joined as plaintiffs in their individual capacities. They did this because they were not only menaced, but they were advised (and doubtlessly felt) that there was a threat to deprive them of rights vouchsafed to them by the Constitution of the United States. The defendants, or some of them, had expressed to the Board, or individual members thereof, the view that any orderly change in the law was too slow a process and that the defendants would compel a rescission of the order of desegregation by intimidation and force, if necessary.

In this situation plaintiffs became entitled to invoke the provisions of Section 4, Article IV, of the national Constitution, as follows:

"The United States shall guarantee to every State in this Union a .

Republican Form of Government, . * * *."

It was their sacred right to function their offices, and to live as citizens under a government of laws and not of men, and they logically appealed to the national courts for protection under the federal law.

The Supreme Court intimated jurisdiction if, in the adjustment to the new order, members of the school board did not act in good faith. To show their good faith it became necessary for the Board of Directors of Hoxie schools (and their duty) to institute and maintain this action so that they might demonstrate their good faith and carry out the orders of the Supreme Court.

In the second place, the Civil Rights statutes are very broad. This is particularly true of Section 1343, Title 28 U.S.C.A. This statute specifically confers upon the district courts "original jurisdiction of any civil action authorized by law to be commenced by any person."

Other statutes provide for both civil and criminal liability in case of interference by conspirators with the civil rights of individuals. See Section 1985, Title 42 U.S.C.A. and Section 241, Title 18 U.S.C.A. In this case it was clear that there was an interference with the rights of individuals vouchsafed to them and guaranteed by the Constitution. If the defendants in fact conspired to deprive (among others) Negro pupils of their constitutional rights, then it would seem proper for the plaintiffs, so closely related as they were to the victims in this case, to bring a restraining suit. They were officials of a great state and an omission by them would, in effect, be a deprivation of rights under color of law.

The defendants should not complain, because, if they were in fact conspirators (the evidence showed that they were, for the purposes mentioned), then each became liable for suits in the civil courts by individuals thus injured and for prosecutions upon appropriate action by a United States grand jury.

That the question here involved arises under the Constitution and laws of the United States can hardly be doubted. Section 1331, Title 28 U.S.C.A.; Section 1, Article XIV, Amendments to the United States Constitution.

3. While not disputing the facts in their briefs, yet able counsel for the defendants urge a total lack of jurisdiction in the national courts. The cases cited and discussed by them were such as arose under former Section 47, Title 8 U.S.C.A., now Section 1985, Title 42 U.S.C.A. This section covers only those cases where there is a deprivation of rights under color of law. Even this section supports jurisdiction because the defendants urged the segregation laws of Arkansas as a basis for their interference. The plaintiffs would have a right, and it became their duty, to administer their offices under the law as directed by the Supreme Court.

█ 4. That the defendants did conspire within the purview of the general law on conspiracy is hardly open to question. It is wholly unnecessary for conspirators to enter into an express agreement to do an unlawful thing, but, if they act in concert as in this case, an agreement is implied and, since direct proof is ordinarily not available in conspiracy cases, the court may reach conclusions based on facts or evidence, even though some of it may be remote.

In this case the defendants did act in concert, and the effect of their agitation and threats was to intimidate patrons of the schools to such an extent as to cause them to withdraw their children from attendance and to compel a suspension of school work, and the act of each conspirator became the act of all.

The issue as to whether the defendants committed the acts or did the things complained against in the petition must be ruled against the defendants, for, as stated, the evidence was overwhelmingly against them. Several of the defendants, though seriously involved and present, did not testify.

5. The evidence showed that the defendants have been obedient to the terms

of the restraining order as well as to the interlocutory injunction granted by Judge Trimble, and that, under the protection of Judge Trimble's order, the school sessions have been carried on smoothly and without untoward event. Able counsel for the defendants urged that this fact would negative the necessity for a permanent injunction.

The testimony, even on the part of the defendants, was convincing that, if the restraining order should be dissolved, there would in all probability be a recurrence of trouble and interference with the operation of the schools in the Hoxie School district. Moreover, the defendants should not complain against an injunctive order that restrains them from doing things that might result in criminal prosecutions and civil suits against them.

6. The writer recalls from history that Patrick Henry, a great patriot and statesman, in the Virginia Convention of 1788, where the only question was whether the State of Virginia would approve and ratify the proposed Constitution for the United States, stoutly opposed and resisted such ratification. He was vehement in his opposition because of what he believed to be a fundamental weakness of the great document. His objection to the Constitution was because of the absence of the Bill of Rights. However, when satisfied of his own defeat, he immediately announced that, though he would not abandon his effort for the inclusion of the Bill of Rights, yet, said he, in substance, I shall fight for the establishment of those rights through legal processes and in conformity with the provisions of law. I shall be a good citizen. The defendants did not do this at first in the case at bar, but, happily, when restrained, they have patriotically yielded to the restraint.

7. Judges should not be unmindful of the customs, mores and sentiments that may have existed among people and in communities over a long period of years and that a sudden overturning or reversal of such habits and customs by an apparent outside force or authority would at first blush be provocative. Under such circumstances logic, and not emotion, should dominate and prompt action. If the change be proper and just, then all should submit without delay. If it be deemed unjust and improper, then orderly processes should be observed to reestablish the custom. Some intemperance of speech and act may be tolerated, and the right of peaceful assembly and petition for redress should be respected and protected. In this case, however, the several assemblies or mass meetings were by inflammatory speeches dissolved into a spirit of revolt against the law and acts were committed and words spoken that destroyed or thwarted one of the main objects of government, which is to insure domestic tranquillity.

8. Counsel for the plaintiffs urged, at the submission of the case, that the defendant James D. Johnson, one of the attorneys in the case, and who was not included in the interlocutory injunction granted by Judge Trimble, should now be named and included in this permanent order. No additional facts are before the writer to justify an action adverse to that of Judge Trimble. Accordingly, Senator Johnson will not be enjoined, and this request will be denied. Since such request was not formally made no order is required as to it.

In the light of the foregoing, the injunctive order of Judge Trimble will be made permanent.

REEVES, District Judge.

I make the following Findings of Fact:

1. The Board of Directors of the Hoxie School District, after due consideration, made an order desegregating the races in relation to pupils in attendance in the several schools under its jurisdiction. It had found that the statutory laws of Arkansas providing for segregation of the races in the public schools had been nullified and in effect held unconstitutional by the Supreme Court of the United States in the several opinions of Brown v. Board of Education of Topeka.

The members of the Board were cognizant of the national constitutional provision which requires an oath to support the Constitution of the United States on the part of all state officers as well as others, and they, being state officers, had taken such oath and felt the duty and obligation to obey such oath by making an order desegregating the races in the public schools of Hoxie. Moreover, they were aware that theretofore the separate facilities for the education of the colored pupils had not been equal to those provided for the pupils of the white race, and, furthermore, the cost of maintaining separate schools aggregated between four and five thousand dollars. These, with others, were the reasons which prompted the Board of Directors of Hoxie School District No. 46 to make the order mentioned.

2. The order of the Board of Directors in thus integrating the races in the public schools of Hoxie was acceptable and agreeable to an overwhelming majority of the patrons of said schools and the residents of the city of Hoxie. The sessions of the school began in July, 1955, and continued without untoward event for a period of approximately three weeks, at which time, because of the facts hereinafter found, at its own instance, and upon the recommendation of the Superintendent of the Schools, the sessions of the schools were ordered suspended to await the further action of the Board.

3. Pursuant to the order of the Board mentioned in the first finding herein, there were mutterings and expressions of disapproval by a few persons, including the defendants, some of whom resided within and some outside the district. These expressions of discontent and disapproval culminated in a mass meeting at the city hall of Hoxie on August 3, 1955. In that meeting those of the defendants who were in attendance or represented by authorized members or officials engaged in inflammatory speech-making and denunciations, all of the same character and purport and revealed a concert of action and a general agree-ment on their part to compel, by force and intimidation, a rescission of the order of the Board of Directors in integrating the races in the public schools. The Fourteenth Amendment to the Constitution was denounced, and while those who indulged in speech-making disavowed violence, yet the utterances disclosed by the evidence showed that the words used, and the very nature of the speeches, would have and did have the effect, not only to encourage violence but to intimidate those who are charged with the responsibility of integrating the races. Other mutterings were heard both within and without the district, all of which, so far as sentiment was concerned, was of the same tenor and effect as the words and actions of those attending the mass meeting on August 3, 1955.

4. Following the first mass meeting and in between and after the others, the defendants, both in meetings with members of the Board of Directors and the individual members thereof, and by telephone calls, and by threats to throw a picket line about the schools, and by acts of terrorism so far as the Superintendent of Schools was concerned, so intimidated the parents and patrons of the schools, as well as the Board of Directors and the Superintendent, as to force a suspension of school activities. The parents of white pupils were alarmed and kept their children from attendance in the schools because of the apparent hazards; and the defendants made personal calls on parents of colored children, at which time they admonished them to withdraw their children from enrollment as pupils in an integrated school system.

5. As a result of the inflammatory propaganda flowing from the mass meetings and individual utterances of the defendants the attendance in the schools declined from fifty to sixty per cent., depending somewhat upon classification and grades. This, if continued, would have the effect to reduce by a considerable amount the allotment of funds made by the state for school purposes, the amount of such allowance depending upon the school attendance.

6. Practically all of the evidence on the part of the plaintiffs tending to support the above findings remains unanswered by the defendants. Although several defendants were present in the courtroom during the trial of this case, they failed to take the witness stand and controvert the rather damaging testimony against them offered by the plaintiffs.

I state the following Conclusions of Law:

### I.

The defendants, having acted in concert for the common purpose of compelling a rescission of the integration order of the Board of Directors of Hoxie School District No. 46, were conspirators, and the acts of each conspirator were binding upon all the others.

### II.

The court has jurisdiction of this case because of the fact that a federal question is involved, and because civil rights were violated, and, lastly, because the defendants were attempting to substitute their own wills in lieu of the law and thus and thereby depriving the plaintiffs of a representative government in the performance of their duties, and as citizens, and the additional reason might be mentioned, that the duties of the Board of Directors were so interwoven and interlocked with the rights and privileges of the colored pupils of the district as to bring the case within the provisions of the Fourteenth Amendment as interpreted by the Supreme Court.

Counsel for plaintiffs have requested, and I have granted all findings of fact proposed by them. Counsel for plaintiffs have also proposed, and I have granted all the declarations of law requested by them.

### Findings of Fact
### and
### Conclusions of Law
### Proposed by Plaintiffs

Plaintiffs respectively request that the Court make the following findings of fact and conclusions of law:

### I.

### Findings of Fact

1. Plaintiff Hoxie School District No. 46 of Lawrence County, Arkansas, is a body corporate under the laws of the State of Arkansas. Plaintiffs L. R. Howell, L. L. Cochran, Howard Vance, Guy Floyd and Leo Robert are directors of said school district. Said directors are executive officers of the State of Arkansas. Plaintiff K. E. Vance is superintendent of said school district. All the plaintiffs are citizens and residents of the United States and the State of Arkansas.

2. Defendant Herbert Brewer is chairman of an unincorporated association of Lawrence County, Arkansas, residents known as "The Citizens Committee Representing Segregation in the Hoxie Schools". Defendant Amis Guthridge is counsel for "The Citizens Committee Representing Segregation in the Hoxie Schools", and is a representative of White America, Inc., a corporation organized under the laws of Arkansas. Defendants James D. Johnson and Curt Copeland are officials and representatives of an unincorporated association known as "White Citizens Council of Arkansas." All of the defendants are residents and citizens of the State of Arkansas and the United States.

3. This is an action by plaintiffs for a permanent injunction and a declaratory judgment. The amount in controversy, exclusive of interest and cost, exceeds the sum of $3,000.

4. Plaintiff directors, as executive officers of the State of Arkansas, operate a school district which at all material times has had a student enrollment of approximately 1,000 white pupils and 25 Negro pupils. On June 7, 1955, plaintiffs determined that they were required by decisions of the Supreme Court of the United States to desegregate the Hoxie schools as soon as all administrative obstacles could be removed. On June 25, 1955, plaintiff Board of Directors made an official determination that all legally cognizable obstacles to desegregation had

been removed in their district, and directed K. E. Vance, as superintendent, to open the schools on a nondiscriminatory basis. On July 11, 1955, Hoxie schools were opened without segregation. The integrated school system operated for approximately three weeks after opening, with satisfactory reaction from pupils and citizens in the community, and without untoward incident. On or about August 3rd, defendants Herbert Brewer and "The Citizens Committee Representing Segregation in the Hoxie Schools" began to challenge the Board's action in desegregating the schools by charging that the plaintiffs' actions in desegregating were illegal under Arkansas law.

On the night of August 3, 1955, defendants Brewer and "The Citizens Committee Representing Segregation in the Hoxie Schools" called a mass meeting at the Hoxie City Hall at which time said defendants made speeches and circulated petitions calling for boycott of the schools. As a result of said boycott approximately 50% of the students, in violation of the compulsory school attendance laws of the State of Arkansas, failed to attend classes. This boycott and reduced attendance continued until the issuance of the temporary injunction in this cause. Further, as a direct result of the August 3, 1955, mass meeting and the actions of said defendants, the Hoxie community was immediately subjected to rumors of violence, threats and intimidations. Because of persistent reports that picket lines would be placed around the school to prevent ingress or egress of pupils who wished to attend school, and reports that school buses would be stopped and passengers removed, many parents who wanted to send their children to school withheld them from attendance because of fear for their personal safety.

5. On the night of August 9, 1955, defendant Brewer and several members of "The Citizens Committee Representing Segregation in the Hoxie Schools" attended the regular meeting of plaintiff school board and presented resolutions, petitions and demands to the plaintiffs that they abolish the integrated school system and return to segregation. At this meeting John Jones, a member of the Committee warned plaintiff directors and superintendent that if they did not send the Negro children back to a segregated school "someone was apt to get hurt". While these defendants were in the meeting making their demands, a crowd of over one hundred persons was milling about outside the school building.

6. On the night of August 13, 1955, defendants Brewer and "The Citizens Committee Representing Segregation in the Hoxie Schools" together with others in active concert with them, held another mass meeting attended by several hundred persons. Speakers on the program included defendants Brewer and Guthridge and Mitchell Davis, duly elected Mayor of the town of Hoxie. Defendant Guthridge renewed the charge that the school board had acted illegally in integrating the schools, and a petition was circulated demanding that the plaintiffs either restore segregation or resign.

7. On the night of August 17, 1955, defendant Guthridge, as attorney for the "The Citizens Committee Representing Segregation in the Hoxie Schools" and an official of White America, Inc., met with the plaintiff school board and superintendent and again charged that plaintiffs had violated Arkansas law by abolishing segregation; that if plaintiffs did not either rescind their action or resign, they would be subjected to endless expensive and unpleasant legal action; and that they would be "smeared". Defendant Guthridge told plaintiffs that he would not be responsible if some of his clients and associates or those acting in concert with them should throw a rock through a car windshield and put out the eye of a plaintiff.

8. In conclusion defendant Guthridge told plaintiffs that if they did not rescind their action and restore segregation and notify him of such action by Saturday of the week in question, he would

"see to it" that a picket line composed of from 300 to 800 persons would be thrown around the school grounds on the following Monday morning. On August 19th, as a direct result of this and other threats, the plaintiffs immediately closed down the schools two weeks early.

Both defendants Guthridge and Brewer were present in the courtroom throughout all proceedings in this cause and did not testify.

9. On Saturday afternoon September 17, 1955, defendants Brewer, Guthridge, "The Citizens Committee Representing Segregation in the Hoxie Schools", White America, Inc., Copeland and Johnson held a mass meeting on the County Court House lawn at Walnut Ridge less than two miles from the Hoxie schools. All of the individual defendants appeared on the platform together, and none expressed any dissent from or disapproval of the statements made in speeches of the others. In addition Poynter, president of White America, Inc., was introduced. Most of the program at the mass meeting consisted of inflammatory speeches impliedly condoning the use of physical violence and mob rule as a method of forcing the plaintiffs to restore segregation in the Hoxie schools.

a. Defendant Copeland made a speech labeling the 14th amendment as a damnable, iniquitous fraud, predicting that "blood would run knee-deep all over Arkansas"; discussing the use of Smith and Wessons and Colts and grass rope as devices successful in keeping "the nigger out of the white bedroom"; discussing rape of a white woman by a Negro in the state of Mississippi for which the citizens lynched the Negro "with a five-cent piece of plow line", thus saving the expense of Court procedure; stating that he participated in the lynching for which he had no apologies since the "power of government is with the people"; suggesting that patrons of the Hoxie school district defy the authorities and refuse to pay taxes.

b. Defendant Johnson followed defendant Copeland on the speaker's platform and attacked F.B.I. men who were in the crowd; discussed the Till murder case in Mississippi and predicted "mongrelization" of white and Negro races if integration was carried out in public schools.

c. Defendant Amis Guthridge, the next speaker, suggested that the school board, by carrying out the Supreme Court's integration order, was "engaged in a revolutionary plot", violently accusing the Methodist Church of favoring the integration of the Negro "into the white bedroom"; and assuring the audience that if someone committed violence against a member of the Hoxie school board, the F.B.I. would be powerless to intervene.

At the conclusion of the speaking, defendants played over their public address system a phonograph record purporting to be in the voice of the "National Association of the Advancement of Colored Peoples' Organization". The purported Negro voice on the phonograph record prophesied that with the coming of integration throughout society it soon would be possible for Negro men to give to white women the sexual pleasures and satisfactions they had previously been denied by segregation. This record was identified by the defendants as having been furnished to them by one Robert Patterson in his capacity as executive official of the "White Citizen's Council of Mississippi" located at Winona, Mississippi.

d. Defendant Brewer was principal speaker at a White America, Inc., meeting at Little Rock September 6, 1955, at which he reported that the boycott of the Hoxie schools was at least 50% effective; that plaintiff Howell, as chairman of the school board, had been so overcome by fear on the night of a meeting of defendants at the Hoxie City Hall that he sent his reply to defendants' demands that the board resign, by his young son rather than put in a personal appearance; and promised the White America audience that "there would be no more mixed classes at Hoxie. If they try it,

they won't have any white children to teach".

e. Approximately three weeks after the schools had opened on an integrated basis, defendant Herbert Brewer and six other white men acting in concert with him and the "Citizens Committee Representing Segregation in the Hoxie Schools", called upon Clarence Braxton, Roy Kelly and Rubin Barksdale, three Negro parents, and urged them to withdraw their children from the integrated schools, in violation of the Arkansas compulsory attendance laws.

11. In addition to the facts set out above, the following specific incidents occurred:

a. Some time after defendants began their operations, Mitchell Davis, Mayor of Hoxie, who had taken part in public meetings of defendants, counseled K. E. Vance, superintendent of schools, that it would be advisable to place guards around the schools to prevent buildings from being burned or blown up.

b. K. E. Vance and other individuals were subjected to annoyances and intimidations by having unidentified automobiles drive up in their yards and drive round and round the block in front of their homes, stop in front of their houses and then drive on. They were subjected to a campaign of anonymous telephone calls. K. E. Vance received persistent reports that he was going to be thrown off a bridge and that he would be tarred and feathered.

c. Defendant Brewer told plaintiff K. E. Vance that the democratic process would take too long to restore segregation and that he was "going to do something about it now".

d. Plaintiffs felt constrained to call upon the services of the State Police to guard school property and to escort at least one school bus around its route.

e. Many parents notified school officials in writing that, although they desired to send their children to school, they had withheld them from attendance because of fear of violence and persistent reports of fighting and rioting on the school premises.

f. Chester Meyers, postmaster at Sedgwick, Arkansas, and a person acting in concert with the main defendants, trespassed upon premises of the Hoxie wing school at Sedgwick and committed a disturbance of the peace by telling the school principal in the presence of pupils in the school that he had come to see "if the principal's face was black or white".

g. Defendants Brewer and Guthridge and other members of the "Citizens Committee Representing Segregation in the Hoxie Schools" trespassed upon school premises at Hoxie and created disturbances by going into class rooms for the purpose of seeing how effectively their boycott of the schools was operating.

h. Clarence Braxton, 73 year old Negro father, received an anonymous letter threatening that his 17 year old son, a student in the Hoxie schools, would suffer the same fate as Emmett Till in Mississippi. As a result of this, the boy was withdrawn from the Hoxie schools and sent to the state of Washington.

i. Plaintiff Leo Robert, who resides in an isolated rural area, was awakened from his sleep shortly after midnight one night by defendant Herbert Brewer and four other members of the "Citizens Committee Representing Segregation in the Hoxie Schools" who were on the front porch with demands for his immediate resignation.

j. Johnny Wyatt, identified as acting in concert with the main defendants, called plaintiff Guy Floyd on the telephone and threatened violence if segregation was not restored.

k. Bob O'Connor, identified as acting in concert with the defendants, told one Andy Buchanan, who lived in a house near Guy Floyd, not to be surprised if his home were turned over by dynamite late some night; that school buses would be stopped from running.

l. Plaintiff Howard Vance received a telephone call from Lloyd Cox, member of the "Citizens Committee Represent-

ing Segregation in the Hoxie Schools", cursing him and threatening him if segregation was not restored. One week before the issuance of temporary injunction in this cause Lynn Moody, identified as acting in concert with the defendants, told Howard Vance that there would be guns at the Hoxie schools if and when an effort was made to reopen the schools on an integrated basis. After the issuance of temporary injunction in this cause on October 14, 1955, many parents and residents of the Hoxie school district received from Winona, Mississippi, a form letter urging defiance of the injunction and condemning the federal government and courts.

9. All of the defendants have engaged in a conspiracy to obstruct plaintiffs from operating the Hoxie schools on an integrated basis and to force parents to withdraw their children from the schools. Such action by the defendants continued until the first restraining order was issued in this cause October 14, 1955.

10. Unless such action by the defendants is permanently restrained, it will result in irreparable injuries, loss and damage to the individual plaintiffs and the plaintiff school district in a sum greater than $3,000 exclusive of interest and cost, for which there is no adequate remedy at law.

11. Irreparable injuries for which there is no adequate remedy at law also would be done to the public interest by the activities of the defendants.

## II.

### Conclusions of Law

1. This Court has jurisdiction of this cause and the parties hereto as found by the Court in its memorandum opinion of October 31, 1955. This includes jurisdiction over the defendant unincorporated associations, "The Citizens Committee Representing Segregation in the Hoxie Schools" and "White Citizens Council of Arkansas", as provided in Rules 17(b) and 23(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Plaintiff school board members had both the right and the duty under Article VI Clause 2 of the Constitution of the United States to refuse to give force and effect to Arkansas statutes which contravene the United States constitution by requiring segregation in the public schools, the same having been heretofore set forth by this Court in its order of October 31, 1955.

2. Said plaintiffs were authorized and required by the 14th Amendment to the Constitution of the United States to desegregate the Hoxie schools after making an official finding on June 25, 1955, that all administrative obstacles to integration had been removed. After such obstacles were in fact removed, all of the individual plaintiffs would have been subject to civil and criminal liability under federal law if they had failed to proceed with desegregation.

3. All of the defendants in this case have joined in the common conspiracy, from which none of the defendants has to date withdrawn, for the express purpose of forcing the plaintiffs to return to segregation in the Hoxie schools. To effect this conspiracy the defendants have resorted to threats, violence and intimidations against plaintiffs and those who uphold their actions. Defendants seek to prevent plaintiffs from exercising their civil right to secure equal protection of the laws to all citizens within the school district. Defendants have challenged the legality of the action of plaintiffs in establishing integrated schools.

4. The actions of the defendants constitute trespassing, disturbance of the peace and violations of the compulsory school attendance laws of the State of Arkansas.

This Court should make permanent its preliminary injunction enjoining all of the defendants, including the defendant James D. Johnson, their agents and those in active concert or participation with them, from attempting trespassing or picketing on property of the plaintiff school district; from attempting to ob-

struct attendance at the plaintiff school of children within the jurisdiction of plaintiff school district; from attempting to interfere with lawful administration of plaintiff school district; from intimidating, threatening or attempting to visit harm on the plaintiffs and to cause them to violate the United States Constitution and the laws of the United States in regard to their official duties.