257 F.2d 33
 John and Thelma AARON, minors, by their mother and next
friend, (Mrs.) Thelma Aaron; et al., Appellants,
v.
William G. COOPER, et al., Members of the Board of Directors
of the Little Rock, Arkansas, Independent School
District, and Virgil T. Blossom,
Superintendent of Schools, Appellees.
 No. 16034.
 United States Court of Appeals Eighth Circuit.
 Aug. 18, 1958.
 
 Wiley A. Branton, Pine Bluff, Ark., and Thurgood Marshall, New York City (Elwood H. Chisolm, Irma Robbins Feder, Constance Baker Motley, New York City, and Spottswood W. Robinson, III, Richmond, Va., of counsel), for appellants.
 Richard C. Butler and A. F. House, Little Rock, Ark., for appellees.
 Before GARDNER, Chief Judge, and SANBORN, WOODROUGH, JOHNSEN, VOGEL, VAN OOSTERHOUT and MATTHES, Circuit Judges.
 MATTHES, Circuit Judge.
 
 
 1
 This appeal is another in a series of legal actions which followed the adoption and implementation of a plan for gradual integration of the public schools in Little Rock, Arkansas, as set up by the school board in that district, and approved by the United States District Court for the Eastern District of Arkansas, and by this Court. See Aaron v. Cooper D.C.E.D.Ark.1956, 143 F.Supp. 855, affirmed 8 Cir., 1957, 243 F.2d 361; Thomason v. Cooper, 8 Cir., 1958, 254 F.2d 808; Faubus v. United States, 8 Cir., 1958, 254 F.2d 797.
 
 
 2
 In conformity with the plan, and under the direction of the Superintendent of Schools of the Little Rock School District (hereinafter called 'District'), approximately sixty Negro students were meticulously screened prior to the opening of schools in September, 1957. Seventeen were accepted for entrance in the final two years in high school, but when eight of the students voluntarily withdrew, the nine remaining attempted to enter the school when it opened. After a series of skirmishes, resulting in the placing of troops around the Central High School building (see Faubus v. United States, supra), the nine Negro students were admitted and eight of them attended the full year. On February 20, 1958, the members of the school board (hereinafter called 'Board') and the Superintendent, filed a petition in the United States District Court, Eastern District of Arkansas, Western Division, asking that the plan of integration 'be realistically reconsidered in the light of existing conditions,' and that it be postponed until such time as the concept of 'all deliberate speed' could be clearly defined. Thereafter, the Honorable Harry J. Lemley, United States District Judge for the Eastern and Western Districts of Arkansas, was designated by the Chief Judge of this Circuit to hear and determine the issues presented by the petition. At the District Court's direction, appellees filed an amended petition in which they alleged that in light of existing conditions, they were of the opinion that a suspension of operations under the plan until January, 1961, was reasonable and advisable. Appellants attacked the petition by a motion to dismiss, contending that the petition was insufficient to state a cause for relief or a claim for relief which would be cognizant under Rule 60(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. They also filed a response to the petition. Following an extended trial of the issues presented by the pleadings, the District Court filed an exhaustive opinion, 163 F.Supp. 13, and entered its order granting permission to suspend the operation of the plan of integration until mid-semester of the 1960-61 school year.
 
 
 3
 From that order, plaintiffs (appellants) prosecuted an appeal to this Court. Because of the vital importance of the time element in the litigation, and in line with the suggestion of the Supreme Court in its per curiam order of June 30, 1958, on petition for certiorari, we heard the appeal on its merits on August 4, 1958.
 
 
 4
 A review of the events leading up to the present appeal, as revealed by the record, is necessary to a proper understanding of the meritorious question for decision.
 
 
 5
 On May 20, 1954, following the decision of the Supreme Court in Brown v. Board of Education on May 17, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the Board adopted a statement concerning the Brown decision, recognizing its responsibility to comply with Federal Constitutional requirements, and on May 24, 1955-- several days prior to the supplemental opinion of the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the Board approved a 'Plan of School Integration,' which provided for a gradual integration of all public schools, beginning with the high school level, in the fall of 1957. See Aaron v. Cooper, D.C., 143 F.Supp. 855 for the plan in its entirety, affirmed 8 Cir., 243 F.2d 361.
 
 
 6
 It was the feeling of the Board that the plan, as proposed, was the most desirable and workable under all of the circumstances, and that as the result of an active public relations program, the public generally approved of the plan. However, a systematic campaign developed which undermined whatever confidence the public might have had in the plan to integrate the public schools. In November, 1956, the people of the State of Arkansas adopted: (A) Amendment 44 to the State Constitution, which commanded the General Assembly to oppose by every constitutional method the 'Un-Constitutional desegregation decisions of May 17, 1954 and May 31, 1955 (the two Brown decisions) of the United States Supreme Court' (1 Ark.Stat.1947, 1957 Supplement); (B) A resolution of interposition which, inter alia, called upon the people of the United States and the governments of all the separate states to join the people of Arkansas in securing an adoption of an amendment to the Constitution of the United States which would provide that the powers of the federal government should not be construed to extend to the regulation of the public schools of any state, or to prohibit any state from providing for the maintenance of racially separate but substantially equal public schools within such state; (C) A pupil assignment law dealing with the assignment of individual pupils to individual public schools. The 61st General Assembly of Arkansas, which convened in January, 1957, enacted Sections 80-1519 to 80-1524, Ark.Stat.1947, known as The Pupil Assignment Law; Section 80-1525, ibid, which relieves school children of compulsory attendance in racially mixed public schools; Sections 6-801 through 6-824, ibid, which established a State Sovereignty Commission; Section 80-539, ibid, which authorizes local school boards to expend district funds in employing counsel to assist in the solution of problems arising out of integration.
 
 
 7
 During the summer of 1957, antiintegration forces, pointing to the recent Arkansas enactments, petitioned for, and received from the Pulaski Chancery Court at Little Rock, an injunction directed against the Board, restraining any action towards integrating Little Rock Central High School during the school term beginning September 3, 1957. On August 29, 1957, on application of the Board, the United States District Court at Little Rock entered an order enjoining the use of the state court injunction in an attempt to block the integration plan. We affirmed this order. Thomason v. Cooper, 8 Cir., 254 F.2d 808.
 
 
 8
 From the testimony of the Superintendent, and voluminous exhibits, consisting mainly of newspaper articles and paid advertisements, it is demonstrated that pro-segregationists carried on a relentless and effective campaign during the summer of 1957. The Governor of Georgia, Marvin Griffin, and Roy V. Harris, publisher, of the same state, and Reverend J. A. Lovell, described as a 'Texas Radio Minister,' appeared in Little Rock and delivered speeches against integration to large audiences. The effect of these efforts may be gleaned from the Superintendent's testimony: (Mr. Blossom)-- 'But there was a tremendous amount of opposition following the appearance of the Governor of Georgia * * * that this plan which had been developed as I explained over a long period of time, seemed to be driven out of everybody's mind. * * * In the minds of people who talked to me the thing that became prevalent (was) 'We don't have to do this when the Governor of Georgia says nobody else has to do it." On July 9, 1957, what purports to be a full page paid statement appeared in the Arkansas Democrat, the first two paragraphs of which are typical, not only of the statement in its entirety, but of other articles appearing from time to time in the same publication:
 
 
 9
 'People of Arkansas vs. Race-Mixing. Official Policy of the State of Arkansas
 
 
 10
 "The People of Arkansas assert that the power to operate public schools in the State on a racially separate but substantially equal basis was granted by the people of Arkansas to the government of the State of Arkansas; and that, by ratification of the Fourteenth Amendment, neither the State of Arkansas nor its people delegated to the federal government, expressly or by implication, the power to regulate or control the operation of the domestic institutions of Arkansas; any and all decisions of the federal courts or any other department of the federal government to the contrary notwithstanding.'
 
 
 11
 'Whose Statement is the Above?
 
 
 12
 'It is the statement of Gov. Orval E. Faubus of Arkansas. It is the core of the Resolution of Interposition which he personally fathered. Governor Faubus hired the solicitors who circulated the petitions to place this Resolution on the ballot. Governor Faubus filed Resolution and petitions with the Secretary of State on July 5, 1956, and the Resolution was submitted to the people in last NOVEMBER'S GENERAL ELECTION. THE PEOPLE OF ARKANSAS BY A TREMENDOUS, OVERWHELMING MAJORITY GAVE IT THEIR THUNDERING APPROVAL.
 
 
 13
 'Sponsored by the Governor of Arkansas, adopted by a tremendous majority of Arkansas voters, THE ABOVE STATEMENT IS THE WILL OF THE PEOPLE OF ARKANSAS.'
 
 
 14
 As September 3rd approached, the opposition to Negro children entering Central High School had stiffened and solidified. On the night of September 2nd, Governor Faubus appeared on television in Little Rock and announced that in the interest of preserving peace, he had called out units of the National Guard, and had directed that the white schools be placed 'off limits' to Negro students, and that the Negro schools be placed 'off limits' to white students. The subsequent events, which ultimately brought forth United States troops, and the entry of the nine Negro children in Central High School, are found in our opinion in Faubus v. United States, supra.
 
 
 15
 The record firmly establishes that although the Negro children attended Central High School during the 1957-58 school term under the protection of Federal troops, and later, federalized national guardsmen, the opposition to the plan of integration by many members of the public, and particularly parents of white students, failed to subside. Whether the white students who were the trouble makers, stood for segregation of the races in schools as the result of their environment over the years, or because of the intense campaign that was focused upon that issue by adults, does not appear, but the indisputable fact is that certain of the white students demonstrated their hostility to integration by overt acts of violence and misconduct, committed within the school building, as well as by destruction of school property through acts of vandalism. The events which occurred during the school year may be summarized as follows:(1) Although there were no unusual events in the classrooms, there were a number of incidents in the halls, corridors, cafeteria and rest rooms, consisting mainly of 'slugging, pushing, tripping, catcalls, abusive language, destruction of lockers, and urinating on radiators.'
 
 
 16
 (2) Forty-three bomb threats necessitated searches of the school building, and particularly the lockers, some 2400 in number. These bomb threats were broadcast on the local radio and television stations, precipitating calls from parents and withdrawal of students for the day.
 
 
 17
 (3) Numerous small fires occurred within the building, particularly in rest rooms where tissue paper and towels accumulated.
 
 
 18
 (4) The destruction of school property throughout the school necessitated the expenditures of school funds, which might otherwise have been used for general maintenance purposes, to repair the damage.
 
 
 19
 (5) Misconduct on the part of some students resulted in approximately 200 temporary suspensions for short periods of time, and two permanent expulsions.
 
 
 20
 (6) The administrative staff in the school spent a great deal of time making reports of incidents, alleged and real, arising out of opposition to the presence of the nine Negro students.
 
 
 21
 (7) Teachers and administrative staff were subjected to physical and mental strain and telephone threats.
 
 
 22
 (8) Inflammatory anti-integration speeches were made at public meetings by speakers from other states, and the local newspapers carried many anti-integration articles.
 
 
 23
 (9) Vicious circulars were distributed condemning the District Court, the Supreme Court of the United States, and the school officials who recognized the supremacy of the Federal law.
 
 
 24
 (10) Vulgar cards, critical of the school officials, were given by adults to school children for distribution within the school building.
 
 
 25
 (11) In general there was bedlam and turmoil in and upon the school premises, outside of the classrooms.
 
 
 26
 Careful and critical analysis of the relevant facts and circumstances in light of applicable legal principles, leads us to the inescapable conclusion that the order of the District Court suspending the plan of integration cannot stand.
 
 
 27
 In Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083, the Supreme Court, in dealing with the manner in which integration should be effected, recognized that full implementation of the constitutional principles involved may require solution of varied local school problems-- and that the school authorities have the primary responsibility for 'elucidating, assessing, and solving the problems.' While the District Courts, aided and guided by equitable principles, may properly take into account the public interest in the elimination of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in Brown v. Board of Education, May 17, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, it should be emphasized that the Court, in the opinion dealing with the relief to be granted, stated (349 U.S. at page 300, 75 S.Ct. at page 756): 'But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.'
 
 
 28
 The precise question at issue herein, i.e., whether a plan of integration, once in operation, may lawfully be suspended because of popular opposition thereto, as manifested in overt acts of violence, has not received judicial consideration. But there is sound and convincing authority that a school board, 'acting promptly, and completely uninfluenced by private and public opinion as to the desirability of desegregation in the community,' must proceed with deliberate speed, consistent with proper administration, to abolish segregation, Jackson v. Rawdon, 5 Cir., 1956, 235 F.2d 93, 96; certiorari denied 352 U.S. 925, 77 S.Ct. 221, 1 L.Ed.2d 160; School Board of the City of Charlottesville, Va. v. Allen, 4 Cir., 1956, 240 F.2d 59, certiorari denied, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664; and while '* * * a good faith acceptance by the school board of the underlying principle of equality of education for all children with no classification by race might well warrant the allowance by the trial court of time for such reasonable steps in the process of desegregation as appears to be helpful in avoiding unseemly confusion * * * nevertheless whether there is such acceptance by the Board or not, the duty of the court is plain. The vindication of rights guaranteed by the Constitution can not be conditioned upon the absence of practical difficulties.' Orleans Parish School Board v. Bush, 5 Cir., 1957,242 F.2d 156 at page 166, certiorari denied 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436. 'The fact that the schools might be closed if the order were enforced is no reason for not enforcing it,' Allen v. County School Board of Prince Edward County, Val., 4 Cir., 1957, 249 F.2d 462, 465, certiorari denied 355 U.S. 953, 78 S.Ct. 539, 2 L.Ed.2d 530, because, as the Court there stated: 'A person may not be denied enforcement of rights to which he is entitled under the Constitution of the United States because of action taken or threatened in defiance of such rights.'
 
 
 29
 In his opinion, 163 F.Supp. 13, 20, which incorporated findings of fact and conclusions of law, Judge Lemley, who has most carefully and conscientiously considered the problem presented, recognized that the occurrences which motivated the instant proceeding were the direct result of general community opposition to integration. He stated:
 
 
 30
 'From the practically undisputed testimony of the Board's witnesses, we find that although the continued attendance of the Negro students at Central High School was achieved throughout the 1957-58 school year by the physical presence of federal troops, including federalized national guardsmen, nevertheless on account of popular opposition to integration the year was marked by reperated incidents of more or less serious violence directed against the Negro students and their property, by numerous bomb threats directed at the school, by a number of nuisance fires started inside the school, by desecration of school property, and by the circulation of cards, leaflets and circulars designed to intensify opposition to integration. * * *
 
 
 31
 'It is important to realize, as is shown by the evidence, that the racial incidents and vandalism which occurred in Central High School during the past year did not stem from mere lawlessness on the part of the white students in the school, or on the part of the people of Little Rock outside the school; nor did they stem from any malevolent desire on the part of the students or others concerned to bomb the school, or to burn it down, or to injure or persecute as individuals the nine Negro students in the school. Rather, the source of the trouble was the deep seated popular opposition in Little Rock to the principle of integration, which, as is known, runs counter to the pattern of southern life which has existed for over three hundred years. The evidence also shows that to this opposition was added the conviction of many of the people of Little Rock, that the Brown Decisions do not truly represent the law, and that by virtue of the 1956-57 enactments, heretofore outlined, integration in the public schools can be lawfully avoided.'
 
 
 32
 '* * * In reaching this conclusion we are not unmindful of the admonition of the Supreme Court that the vitality of those principles 'cannot be allowed to yield simply because of disagreement with them'; here, however, as pointed out by the Board in its final brief, the opposition to integration in Little Rock is more than a mere mental attitude; it has manifested itself in overt acts which have actually damaged educational standards and which will continue to do so if relief is not granted.'
 
 
 33
 Appalling as the evidence is-- the fires, destruction of private and public property, physical abuse, bomb threats, intimidation of school officials, open defiance of the police department of the City of Little Rock by mobs-- and the naturally resulting additional expense to the District, disruption of normal educational procedures, and tension, even nervous collapse of the school personnel, we cannot accept the legal conclusions drawn by the District Court from these circumstances. Over and over again, in the testimony, we find the conclusion that the foregoing turmoil, chaos and bedlam directly resulted from the presence of the nine Negro students in Central High School, and from this conclusion, it appears that the District Court found a legal justification for removing temporarily the disturbing influence, i.e., the Negro students. It is more accurate to state that the fires, destruction of property, bomb threats, and other acts of violence, were the direct result of popular opposition to the presence of the nine Negro students. To our mind, there is a great difference from a legal standpoint when the problem in Little Rock is stated in this manner. From the record it appears that none of the Negro students was responsible for the incidents on the school property, and the one Negro expulsion seems to have resulted after the Negro student was physically struck in the face, following which it was found that the student had 'failed to adjust,' in violation of an agreement with the school board not to become embroiled in incidents.
 
 
 34
 This Court recognizes that, following the first Brown decision, the members of the Board, acting in good faith, and working with the Superintendent of Schools, moved promptly to promulgate a plan designed to gradually bring about complete integration in the Little Rock public schools, and they are to be commended for their efforts in that regard. We are also not unmindful of the difficulties which were faced by the board members and school administrators in attempting to give life to the plan of integration. As we have seen, they have been constantly harassed; they have met with overt opposition from the public, and the legislature through passage of the 1957 enactments. The executive department of the State of Arkansas has openly opposed their efforts, as demonstrated by the statement by the Government of the official policy of the state of Arkansas against integration, followed by the use of National Guardsmen to prevent entry of Negro students. The result was to place the Board between 'the upper and the nether millstone.' See Thomason v. Cooper, 254 F.2d 808, at page 810. While it may appear to the members of the Board and the Superintendent, that they have a thankless task, they may be recompensed by the knowledge that throughout, they, as public officers, have recognized their duty to support the Constitution of the United States, and to respect the laws and courts of our Federal Government, and our democratic ideals, regardless of their personal convictions with respect to the wisdom of school integration.
 
 
 35
 It is not the province of this Court in this proceeding to advise the Board as to the means of implementing integration in the Little Rock Schools. We are directly concerned only with the legality of the order under review. We do observe, however, that at no time did the Board seek injunctive relief against those who opposed by unlawful acts the lawful integration plan, which action apparently proved successful in the Clinton, Tennessee and Hoxie, Arkansas situations. See Kasper v. Brittain, 6 Cir., 1957, 245 F.2d 92, certiorari denied 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46, rehearing denied 355 U.S. 886, 78 S.Ct. 147, 2 L.Ed.2d 115; Hoxie School District No. 46 of Lawrence County, Ark. v. Brewer, D.C.E.D.Ark., 137 F.Supp. 364, affirmed Brewer v. Hoxie School District, 8 Cir., 1956, 238 F.2d 91. The evidence also affords some basis for belief that if more rigid and strict disciplinary methods had been adopted and pursued in dealing with those comparatively few students who were ring leaders in the trouble making, much of the turmoil and strife within Central High School would have been eliminated.
 
 
 36
 An impossible situation could well develop if the District Court's order were affirmed. Every school district in which integration is publicly opposed by overt acts would have 'justifiable excuse' to petition the courts for delay and suspension in integration programs. An affirmance of 'temporary delay' in Little Rock would amount to an open invitation to elements in other districts to overtly act out public opposition through violent and unlawful means. The Supreme Court of the United States has specifically determined that segregation in the public schools is a deprivation of the equal protection of laws guaranteed by the Fourteenth Amendment. The Board, by public statement, has recognized its constitutional duty to provide non-segregated educational opportunities for the children of Little Rock; the District Court, in its memorandum opinion, supra, 163 F.Supp. at page 30, stated: '* * * it is not denied that under the Brown decisions the Negro students in the Little Rock District have a constitutional right not to be excluded from any of the public schools on account of race;'. Acting under a federal court order, the Board did proceed with a fair and reasonable program for gradual integration, which program had previously been approved by this Court. The issue plainly comes down to the question of whether overt public resistance, including mob protest, constitutes sufficient cause to nullify an order of the federal court directing the Board to proceed with its integration plan. We say the time has not yet come in these United States when an order of a Federal Court must be whittled away, watered down, or shamefully withdrawn in the face of violent and unlawful acts of individual citizens in opposition thereto.
 
 
 37
 Mindful as we are that the incidents which occurred within Central High School produced a situation which adversely affected normal educational processes, we nevertheless are compelled to hold that such incidents are insufficient to constitute a legal basis for suspension of the plan to integrate the public schools in Little Rock. To hold otherwise would result in '* * * accession to the demands of insurrectionists or rioters * * *,' Strutwear Knitting Co. v. Olson, D.C., 13 F.Supp. 384, at page 391, and Faubus v. U.S., 8 Cir., 254 F.2d 797, at page 807, and the withholding of rights guaranteed by the Constitution of the United States. Accordingly, the order of the District Court is reversed, with directions to dismiss the appellees' petition.
 
 
 38
 GARDNER, Chief Judge (dissenting).
 
 
 39
 I would affirm on the grounds stated by Judge Lemley in his opinion. Aaron v. Cooper, D.C.E.D.Ark., 163 F.Supp. 13.
 
 
 40
 Because of the limitation of time within which this case must be decided it is not possible to prepare a dissenting opinion and, hence, I am preparing only a short memorandum.
 
 
 41
 It is conceded that the school authorities have acted in good faith both in formulating a plan for integrating and in attempting to implement that plan. Their efforts in this regard were met with unprecedented and unforeseen opposition and resistance as set out and enumerated in the majority opinion. This opposition included acts of violence to such an unprecedented extent that the armed forces of the United States were stationed in and about the school building. The events pertinent to the attempts of the school authorities during the school year to implement its plan for integrating are set forth in the majority opinion. The normal conduct of the school was continuously disrupted and the state of mind, both within and without the school, was to a greater or lesser extent in a state of hysteria. Under circumstances and conditions set out in Judge Lemley's opinion the school authorities made application for an extension of time so as to permit a cooling off or breathing spell so that both pupils, parents, teachers and the public might to some extent become reconciled to the inevitable necessity for public school integration. Having in mind that the school officials and the teaching staff acted in good faith and that the school officials presented their petition for an extension of time in good faith, it was the duty of the court 'to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles.' Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083. In this situation the action of Judge Lemley in extending the time as requested by the school officials was the exercise of his judicial discretion. The background is well set forth in Judge Lemley's opinion. For centuries there had been no intimate social relations between the white and colored races in the section referred to as the South. There had been no integration in the schools and that practice had the sanction of a decision of the Supreme Court of the United States as constitutionally legal. It had become a way of life in that section of the country and it is not strange that this long-established, cherished practice could not suddenly be changed without resistance. Such changes, if successful, are usually accomplished by evolution rather than revolution, and time, patience, and forbearance are important elements in effecting all radical changes. The action of Judge Lemley was based on realities and on conditions, rather than theories. The exercise of his discretion should not, I think, be set aside as it seems to me it was not an abuse of discretion but rather a discretion wisely exercised under the conditions. We should not substitute our judgment for that of the trial court. Judge Lemley's decision is not without precedent in principle. It is, I think, warranted by the decision of the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. See also Allen v. County School Board of Prince Edward County, D.C.E.D.Va., 164 F.Supp. 786; Davis v. County School Board of Prince Edward County, D.C.E.D.Va., 149 F.Supp. 431; State of Wisconsin v. State of Illinois, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426, modified 281 U.S. 179, 50 S.Ct. 266, 74 L.Ed. 799; 289 U.S. 395, 53 S.Ct. 671, 77 L.Ed. 1283; 309 U.S. 569, 60 S.Ct. 789, 84 L.Ed. 953; State of Wisconsin, Minnesota, Ohio, & Penn. v. State of Ill., 311 U.S. 107, 61 S.Ct. 154, 85 L.Ed. 73; Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619. It was the judgment of the school officials as indicated by their petition and, after hearing, the judgment of the trial court, that the extension of time requested should be granted. I do not think it can be said that the findings of the trial court and its conclusion based thereon are clearly erroneous. I would affirm.