Harold L. **LANGFORD**  et al., Plaintiffs,

v.

**CITY OF TEXARKANA, ARKANSAS**
et al., Defendant.

No. T–71–C–1.

United States District Court,
W. D. Arkansas,
Texarkana Division.

Jan. 26, 1972.

John T. Lavey, Little Rock, Ark., for plaintiffs.

Willis B. Smith, Jr., and Charles M. Conway, of Smith, Stroud, McClerkin & Conway, Texarkana, Ark., for defendants.

## MEMORANDUM OPINION

PAUL X WILLIAMS, District Judge.

Texarkana, Arkansas operates under "City Manager" plan. The City Manager is selected by the Board of Directors. The statutory authorization is set out in Ark.Stats.Ann. 19–712 (Repl.1968).

When the United States Model Cities Program came along, Texarkana, Arkansas had the vision to take advantage of it and in due course a very substantial sum of federal money was made available to and for the use of Texarkana to carry out the purpose for which the Model Cities Program was enacted.

The proper administration of the Model Cities Program required an organization which Texarkana provided. In chart form, the chain of authority was as follows:

In actually hiring personnel, the City Manager selected and employed Tom McRae as head of the "Community Development Department," then entrusted to Mr. McRae the matter of hiring the personnel in his department. The City Manager was available to confer with Mr. McRae and was in close touch with him, ready to counsel and assist, but the actual selection of Mr. McRae's personnel was entrusted to Mr. McRae.

Mr. McRae hired Harold L. Langford to head the "organization" division of his Community Development Department. Texarkana has a substantial population of blacks and since a great deal of the organization work involved work with black people, it appeared desirable that a black person be put in charge of organization in order to get maximum cooperation. Harold L. Langford, a black, was in his early thirties, a graduate of a Massachusetts College, of good appearance and active in civic affairs among the blacks of the area. He

seemed the best man for the position. He was employed and entered on the duties of his position as head of the organization division, among which were the duties of selecting and supervising community organizers. Although it is a matter in dispute, it appears to be true that when Mr. McRae hired Harold L. Langford, Mr. McRae was fully aware that Langford had worked at the Dunbar School where he had been fired, had worked for Lone Star, when he had been fired and that Mr. Langford was keenly interested in politics and active in that field, particularly among the blacks.

Among the community organizers hired by Harold L. Langford were Mrs. Viola Ribble and Mrs. Jimmie Johnson, each a white person.

Mrs. Jimmie Johnson has a small son and is either separated or divorced. On June 15, 1970, the date she was hired by Harold L. Langford, she lived in an all white public housing development complex called "High Point Court" in

Texarkana. As stated in plaintiffs' brief, "while she resided there, she allowed blacks, including Langford, and whites to socialize at her apartment." The hours of "socializing" were erratic, some times quite late and sufficient in departure from the general demeanor of other residents in that community that the manager of the housing complex either talked or attempted to talk with Mrs. Johnson about it. Harold L. Langford knew of the living habits of Mrs. Johnson and either knew or should have known that Mrs. Johnson's ability and competency as an organizer was being affected in Texarkana by the notoriety of her conduct.

After the confrontation with the manager of the "High Point Court" complex Mrs. Johnson removed herself to the "Preston Circle" complex, a predominantly Black complex and there she continued to allow blacks, including Harold L. Langford, and whites to meet and socialize.

Mrs. Viola Ribble was hired by Langford on August 16, 1969 and was assigned to work in the South Texarkana neighborhood council. She was considered by Langford to be his best organizer. Mrs. Ribble had one and a half years of training in business college above high school. She is either separated or divorced. She testified in her own behalf at the trial of this case on its merits and appeared knowledgeable and well able to express herself. She seemed to be genuinely interested in the Model Cities Program.

As stated above, she was assigned to work in the South Texarkana neighborhood which almost necessitated that she work in some degree of cooperation with the local council president, Mr. Vincent Glorioso. This she was unable to do— and regardless of which of them was right or wrong on the issues where they differed—they were at cross-purposes which was not for the best interest of the Model Cities Program. Langford was knowledgeable of this fact and critical that the elected president of the council was given as much consideration as

he was. Neither Langford nor Mrs. Ribble seek to conceal the fact that each has but slight regard for Vincent Glorioso and his wife and needless to add, when Mr. Glorioso testified, he was plain in stating that he did not have high regard for Langford, Ribble, or Johnson, but to the contrary that in his opinion each is unfit for employment by the City in the Model Cities Program.

Mrs. Ribble's efficiency and competency in her employment by the City were further affected by the publicity given to her association with Mr. Lyle Hendricks, a married man with whom Mrs. Ribble was keeping company—or at one time kept company. Mrs. Hendricks, wife of Lyle Hendricks, made complaint and gave the matter such publicity that the neighborhood was fully aware of the fact that Mrs. Ribble was having dates with Lyle Hendricks. Further notoriety occurred when the police were summoned to quell a disturbance where Lyle Hendricks was involved and the situs was a place where Mrs. Ribble was at least temporarily, in presence. This unfavorable notoriety was well known to Harold L. Langford, who took sides with Mrs. Ribble.

The above recited facts were also known to Tom McRae, the head of the Community Development Program, and to Mr. Paul Shriever, the City Manager, each sharing some of the information and each influenced to a degree by information from independent sources. They talked about the matter of whether or not the entire picture rendered Langford, Ribble and Johnson incapable and undesirable as City employees. Mr. McRae thought that they should be retained, but the City Manager, Mr. Shriever, after full evaluation reached the considered judgment that each was unfit and undesirable and told Mr. McRae to fire them. This conversation between the City Manager and Mr. McRae occurred on Saturday, November 28, 1970.

On Monday November 30, 1970, Mr. Tom McRae informed each of the

three that their employment with Texarkana was terminated.

Langford, Ribble and Johnson consulted among themselves and with the other employees within the "organization group" and there was some discussion that the entire group would walk out and quit; but Langford told them to stay on—that the program was too important to be disrupted by the firing of three people and that in his opinion it was better for them not to quit.

But the three thought they were entitled to be heard by the City Manager; so they called on the City Manager, Mr. Shriever, at his office. The complainants state in their trial brief as follows:

"Langford, Johnson and Ribble arrived at Shrievers office at City Hall at or about 9:45 a. m. Langford initiated the conversation with Shriever in his office, and informed him that they had just been informed that they had been fired, and they wanted to know why. Shriever stated that he was a Christian man and would be perfectly candid about their respective discharges. Shriever stated to Ribble, 'Viola, why did you cross swords with Vincent Glorioso?' Ribble answered, 'He is just one man, and the people are supposed to run this program.' Langford stated, 'Why do you always listen to him; he is like the eighth member of the board.' He also told Shriever that they were bound to step on a few toes because of the type of work they performed in the Model neighborhoods, and admonished Shriever that the board had never given his component any support. Shriever answered that he was aware of their work. Ribble told Shriever that Glorioso had been making a determined effort to discharge her, and had circulated a petition attempting to accomplish that end. She also told Shriever that Glorioso had stated that these people were trash and that he had no interest in the program. Ribble asked Shriever why he listened to Glorioso and volunteered 'That man is sick.' Shriever retorted, 'Yes, and his wife is even sicker than he is.' At

this point, Shriever turned to Langford and told him that, if he had known about his past employment record, he would not have hired Langford. Langford asked Shriever to be specific. Shriever then detailed to Langford an investigation he had conducted, which revealed that Langford possessed a bad temperament and lacked authority in the classroom. Shriever stated that he had been informed that Langford taught subjects that were not germane to the ratio studio-rum fashioned by the Hooks, Texas, school district. Langford asked Shriever if he had reference to a nudist colony he had stumbled upon when he was in the army in Germany. Shriever answered affirmatively. At this point Ribble told Shriever that he fired Langford because Langford would not terminate her. Shriever answered, 'Viola, you should be aware of the politics of this thing.' Shriever admonished that she was an activist working out in the community with the poor people and that Langford was a revolutionary young man. Shriever informed them that he was a buffer between the reactionaries in the community and the group represented by Langford and Ribble. Shriever informed them, 'We are not here to pave the way but here to serve,' and 'We are not Don Quixotes.' At this junction, Shriever told them that with the Mitchell Young referendum approaching and the additional pressure that Glorioso was exerting on the board, he had to terminate them.

"Ribble asked Shriever why he fired Johnson. Shriever replied that he had received complaints from Buster McCarley pertaining to Johnson allowing blacks and whites to visit her apartment at High Point Court, which upset some of the neighbors. Johnson told Shriever that she had been aware of McCarley's complaints prompting her to go see him to discuss them. Johnson told Shriever she confronted McCarley with those complaints, and he informed her that this constituted no problem to him. Shriever stated that

he had additional complaints from two Frank Rowe construction workers, who said that Johnson allowed blacks and whites to visit her house. At this juncture, Shriever turned to Langford and pointed his finger at him and said, 'Harold, you also have been seen there.' Johnson explained that she did allow blacks and whites to visit her house and that some blacks had assisted her to move from High Point Court to Preston Circle. She also told Shriever that when she went to buy her house at Preston Circle from Rowe, he questioned her about moving into that neighborhood. He inquired whether Johnson wanted to raise her children there, and Johnson informed him that she felt this was not a problem because she had grown up with blacks and it had no adverse effect on her. Rowe asked Johnson if someone had sent her to buy the house, and Johnson replied negatively. At this point, Rowe told Johnson, 'I shall let you have the house, but I do not want any nigger bucks coming in and out of it.'

"Langford informed Shriever that the black community was going to view his discharge with a jaundiced eye and would look upon it with disfavor. Langford admonished Shriever that the termination of Johnson and Ribble was a blow to the poor people in Texarkana, because each of those individuals had worked assiduously on behalf of that class. Shriever asked them what were their plans. Johnson informed Shriever, 'Well, mine is to keep food on the table for my son.' Shriever stated that he and McRae had influence and could assist them to find jobs. Langford asked, 'Would that be a job in the Model Cities Program.' Shriever answered, 'No, in some related field.' The conference with Shriever ended on that note.

"At or about 11:00 a. m. on November 30, 1970, Langford had a conversation with McRae, and told McRae that his termination was due to nothing but racism. McRae agreed.

"On November 30, 1970, McRae sent Shriever a memorandum in which he stated that there were no facts justifying the termination of Langford, Johnson and Ribble. In fact, McRae stated, 'The employees in question have been both loyal and professional.' "

There is some variance in the descriptions of this encounter, but Mr. Shriever and the three complainants are in accord that Mr. Shriever informed them that each was fired.

Subsequently Langford's old position has been filled by Ruben Drake, a black person who had been assistant to Harold L. Langford.

Each of the complainants now has other employment, but not as lucrative as the positions from which discharged.

In the present action complainants allege that each was fired for an unconstitutional reason; that each is a public employee and that the law forbids that a public employee be fired for an unconstitutional reason.

The City of Texarkana denies that any complainant was fired for an unconstitutional reason, but that on the contrary each complainant was discharged by the City for:

1. Not effectively performing the duties required of their respective positions.

2. Additionally, in the case of Plaintiff Ribble, for misconduct that became known throughout the community, thus impairing her ability to adequately perform her job; the same misconduct was a violation of the City of Texarkana, Arkansas's personnel policies.

3. None of the three Plaintiffs were able to gain the confidence of their Neighborhood Council President with whom they were directly involved, and lacking rapport with said Council Presidents the Plaintiffs were unable to effectively perform the job for which they were employed.

First we must consider the reason for the discharge of these three employees, for it is the true or real motive with which we are concerned, and in considering the true reason for discharge we necessarily must consider the reason for their employment in the first place.

Each of the three was employed by the City to work in the Model Cities Program. It was never contemplated that their employment would be for a long period of time. Each employee was employed for only a limited time and knew it or should have known it.

Further, each was employed to do work for the "organization" phase of the program—Langford to be in charge of the division and the two workers as community organizers. If and when their services were no longer needed, their employment was to end.

It is with a full appreciation of this nature of their employment and the work to be performed by them that we evaluate the action of the City of Texarkana in discharging Langford, Ribble and Johnson to determine what was the true reason.

Each plaintiff contends that Texarkana fired him or her for an unconstitutional reason. Texarkana contends that it fired each of the plaintiffs for good cause, that cause being that plaintiffs had each proved he or she could not do the job for which employed.

■ Texarkana, acting through its authorized officers, made a calculated determination based upon the whole picture that each employee was not effectively performing the duties required of him or her. The factors which entered into that determination by the authorized City officials may or may not have included a consideration of the interrelated conduct of Mrs. Johnson, a white person and Harold L. Langford a black, but let us assume that it did and also let us assume that both Mrs. Johnson and Harold L. Langford had a right to associate together at all hours and all places. While Texarkana is not entitled to be concerned with trying to keep Langford and Mrs. Johnson from associating together as citizens and/or as persons, if the exercise of their right to associate (if that right exists) creates such a state of community rejection in the Texarkana area that it destroys or materially and substantially impairs the ability of Langford and Johnson to discharge the duties of their City employment, then Texarkana is required to step in and terminate their employment.

This matter of association need not be the sole and only part of the employees' conduct that is considered by the City in evaluating an employee. Texarkana has the right to consider the picture as a whole.

What has been said applies equally to all three of the complainants, inasmuch as the conduct of Viola Ribble and Lyle Hendricks was publicly known and criticized. In addition, Mrs. Ribble could not get along with the president of the council and openly politicked against him. Her conduct in this regard was well within her rights as a citizen, but when her conduct with this included was such that it materially impaired her ability to perform the duties for which the City employed her, then the City had not only the right, but the duty to examine her employment.

The statement is made in argument that Langford was discharged because of race. This appears to be without foundation. He was employed because of his overall abilities including the fact that he was black. When he was discharged his successor and the man he himself recommended was another black man, Ruben Drake. The Court finds that race had nothing whatever to do with the action of the City in discharging Langford.

The City Manager, Mr. Shriever, testified that color and race had nothing whatever to do with his evaluation of Langford and his decision that Langford was not and could not do the job. Mr. Shriever's evaluation, as summarized by the plaintiffs in their trial brief and as quoted above, points out that the inability of any of the three to get along

with the Council President was of major consideration; the inability of the three to accept what Mr. Shriever described as the political climate of the area was considered; the fact that they "stepped on many toes" was considered. And doubtless the fact that Langford told Shriever to his face that he had never given the "organizational" division any support was not overlooked by Mr. Shriever.

In addition, Mr. Shriever had received outside complaints as to Langford and had initiated an independent inquiry as to Langford's acceptance in the community and at the interview in the City Manager's office told the three that the inquiry convinced him that they had made a mistake inasmuch as Langford possessed a bad temperament, that as a school teacher he had lost his job when he had dwelled at too great length on sex subjects in his classes, (specifically descriptions of a nudist colony Langford had seen) and that Langford was a revolutionary young man.

Mr. Shriever testified that as City Manager, in performing duties required of him as such, he considered all of the information available to him and had made his decision based on the entire picture, not on any one thing and that his decision was only after due deliberation and consideration.

The Court notes that this was the proper and required way for the matter to be handled. Under the City Manager Plan, the City Manager is cloaked with authority to make this type evaluation. It is not a question of whether Tom McRae made the same evaluation or anyone else would have made the same evaluation as the City Manager did; but it was and is Mr. Shriever's duty and prerogative. There was ample proof to show that his action was not arbitrary or capricious.

Complainants, Langford a black and Johnson a white person, contend they were discharged for the reason they had associated together. Complainant Ribble contends that she was discharged because she had dates with another woman's husband. All complainants contend that these reasons are unconstitutional reasons for discharging a public employee.

Texarkana contends that under the total circumstances it discharged each of the complainants because of inability to perform the tasks of employment.

■ This Court must determine whether or not Texarkana was justified in discharging the three as it did.

The Court finds that it was.

The Court finds as a fact that none of the three was able to gain the confidence of the people with whom they were required to work—that the attitude of each of them was one of "superior disregard and contempt" rather than an attitude of "cooperation" and that a true evaluation of the whole picture reveals that each was unable to perform the duties of his or her position.

Having actually decided the case on the facts and with full realization that no further explanation is required, we nevertheless add the following remarks:

There are cases which hold that if the State creates in its employees a reasonable expectation of reemployment or retention, then their employment can only be terminated under procedures which accord them due process. Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970), Freeman v. Gould Special School Dist., 405 F.2d 1153 (8th Cir. 1969) cert. denied; 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93.

■ The facts in this case are such that each employee knew his employment was for only a limited time and his employment was for a definite purpose. These facts do not create a reasonable expectation of reemployment or retention.

Had the United States cancelled or withdrawn its Model Cities funds, all the employees would have lost their jobs because there would have been no money with which to pay their wages.

■ We started out with full appreciation of the fact that there is no con-

stitutionally protected right to government employment. See Bailey v. Richardson, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951); Cafeteria and Restaurant Workers Union Local 473, AFL–CIO v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); and Jenson v. Olsen, 353 F.2d 825 (8th Cir. 1965); where it was held that a hearing is not required where the only thing at stake is a specific job.

The 14th Amendment only protects against the State depriving one of life, liberty or property without due process. It has consistently been held that government employment is not "property," certainly it is not liberty or life.

Since neither property, liberty or life is concerned in this case involving a mere contract of employment, this Court is unable to find a violation of the 14th Amendment or a requirement for due process.

Perhaps the Court should discuss the contention that each complainant had the right of "Freedom of Association" and that any consideration of such freedom or liberty by the City was an infringement of a Constitutional right.

This contention is based chiefly on language found in an Arkansas case which made its way to the United States Supreme Court, the case of Shelton v. Tucker, (1960) 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 which arose over an Arkansas Act that required every school teacher to reveal and file a list of all organizations to which he belonged and contributed to in the last 5 years. The Supreme Court, in a divided opinion, held that such a requirement was invalid; but the overall effect of the case holding was, and is, to the effect that a State has the right to investigate the competency of an employee and states that there is no federal requirement that conduct in the classroom is the sole basis for consideration in determining fitness —that fitness to teach depends on a broad range of factors.

The Shelton case should be read along with the case of Beilan v. Board, (1958) 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414, which holds that the right of freedom and privacy exists only under appropriate circumstances and then must be weighed against any countervailing public interest.

Interestingly, Court imposed restrictions on termination of employment may possibly constitute an invasion of the legislative prerogative and be unconstitutional under the separation of powers provisions of the United States Constitution.

Theoretically, at least, the Constitution means the same today as on the day it was adopted—and at that early date a public employee enjoyed no tenure and could be fired at will. In fact, in political contests it was expected that the winner would replace employees with new employees of his own selection.

Civil service laws and tenure laws have been enacted by the Legislative branch and have been found to be an improvement over the spoils system; but, although Courts have authority to "legislate" in a proper case in order to protect jurisdiction, it is highly questionable that the Courts have the right or power to legislate either tenure, right to employment, or due process.

The basic contract of "employment" is simply and merely that if one works for another he will receive remuneration at the contracted rate.

It is stipulated in this case that there is no Union contract or problem involved and no Civil Service or tenure law that applies.

Doubtless there have been many occasions when a Justice, a Judge or a Court has viewed a contract problem and has "legislated" provisions into the contract of employment because it seemed to be good, equitable and desirable that under the circumstances of that case, a particular remedy be afforded. But under our system of government, the legislation is required to come from the Legislative branch of our government and it

is not proper that the Courts should do violence to an employment contract merely because of the individual social beliefs of the Justice, Judge or Court trying the case.

Nor is the violation of the separation of powers provisions made more palatable when Court legislation is tied to school teachers contracts in cases when the real matter at issue is segregation and/or integration. Let us hope that such teacher contracts and their place in the field of contract law in Arkansas have been finally determined by the Arkansas Supreme Court in its January 24, 1972 decision in the case of Nethercutt et al. v. Pulaski County School, 475 S.W.2d 517.

The prayer of each plaintiff as set forth in the complaint is hereby denied.

The plaintiffs will pay their own costs.

The defendant will pay its costs.