**Harold H. LANGFORD et al.,**
**Appellants,**

v.

**CITY OF TEXARKANA, ARKAN-**
**SAS, et al., Appellees.**

No. 72–1187.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 10, 1973.

Decided April 25, 1973.

---

John T. Lavey, Little Rock, Ark., for appellants.

Willis B. Smith, Jr., Texarkana, Ark., for appellees.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

We are asked on this appeal to reverse the trial court and to hold, as a matter of law, that two employees of the City of Texarkana, Arkansas, were discharged in violation of their constitutional rights—primarily the right to associate freely with persons of all races.

The underlying facts can be simply stated. Texarkana was selected to participate in the federal government's Model Cities Program. The Community Development Department of the City

was given the responsibility for administering the program, and Tom McRae was named director of that department. McRae hired Harold Langford, a black, to head the Community Organization Division of the department. Langford, in turn, employed Mrs. Jimmie Johnson, a white.[1]

On November 28, 1970, McRae was told by the City Manager, Paul Schriever, to discharge Langford and Johnson. Schriever had acted on orders from the Board of Directors of the City, and the Mayor with respect to Langford. McRae objected to the discharges, but carried out his assignment on November 30. Thereafter, Langford and Johnson sought and were denied reinstatement. They then brought this action, alleging they were discharged without notice or hearing in violation of the due process clause of the Fourteenth Amendment to the United States Constitution,[2] and for exercising their right to freely associate with persons of all races in violation of the First, Ninth and Fourteenth Amendments to the Constitution. Langford further alleged that he was discharged for his political beliefs and activities.[3]

The matter was tried to the court. The City introduced testimony designed to prove that Langford was ineffective in his job, that he was unable to get along with elected presidents of neighborhood councils, that he failed to discipline his subordinates for conduct detrimental to the program, that he had failed to organize the Central Business District, and that he had an unacceptable record of prior employment.

Langford, on the other hand, presented testimony tending to prove that he was an effective employee who had been discharged over the objection of McRae, and that factors in the discharge were his interracial associations and his political activities and beliefs. Langford's witnesses also testified that McRae was fully aware of Langford's past record when he employed him, and that Langford had been instructed by his superiors not to organize the Central Business District because they feared it would be taken over by VISTA workers who lived there.

Witnesses for the City testified that Mrs. Johnson was a probationary employee who could be fired without cause,[4] but that there was, nonetheless, cause to fire her because she failed to organize a neighborhood council in the Central Business District and because she permitted blacks and whites to visit her home at all hours of the day and night.[5]

Mrs. Johnson, on the other hand, presented testimony tending to show that she was a competent employee, that she had been instructed not to organize the Central Business District and that a factor in her discharge was her associa-

1. A third discharged employee, Viola Ribble, was a party to this action below. She has not appealed the judgment of the District Court, sustaining her discharge.

2. The plaintiffs, on this appeal, have not pursued their argument that their constitutional right to a due process hearing prior to termination was violated.

3. We find no evidence in the record to support Langford's allegation that he was discharged for exercising his First Amendment right of freedom of expression.

4. The defendants argue that both Johnson and Langford could be discharged at will because Johnson was a probationary employee and neither was covered by "any union contract, tenure or by civil service

sanctions." These factors do not affect the right of either plaintiff to relief if they were discharged for reasons which are arbitrary, discriminatory, or otherwise in violation of their constitutional rights. See, Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) ; Freeman v. Gould Special Sch. Dist. of Lincoln County, Ark., 405 F.2d 1153, 1159 (8th Cir.), cert. denied, 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93 (1969) ; McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968).

5. No direct testimony was introduced to substantiate Schriever's charge that persons visited Johnson at all hours of the day or night. See, n. 6.

tion with black men, including Langford.[6]

The trial court discussed the applicable law and the evidence in a memoran-

6. According to the plaintiffs, at a meeting following their dismissals between them, Ribble and Schriever, the latter indicated that interracial associations were a factor in the discharges:

"Ribble asked Schriever why he fired Johnson. Schriever replied that he had received complaints from Buster Mc-Carley pertaining to Johnson allowing blacks and whites to visit her apartment at High Point Court, which upset some of the neighbors. Johnson told Schriever that she had been aware of McCarley's complaints prompting her to go see him to discuss them. Johnson told Schriever she confronted McCarley with those complaints, and he informed her that this constituted no problem to him. Schriever stated that he had additional complaints from two Frank Rowe construction workers, who said that Johnson allowed blacks and whites to visit her house. At this juncture, Schriever turned to Langford and pointed his finger at him and said 'Harold, you also have been seen there.' Johnson explained that she did allow blacks and whites to visit her house and that some blacks had assisted her to move from High Point Court to Preston Circle. She also told Schriever that when she went to buy her house at Preston Circle from Rowe, he questioned her about moving into that neighborhood. He inquired whether Johnson wanted to raise her children there, and Johnson informed him that she felt this was not a problem because she had grown up with blacks and it had no adverse effect on her. Rowe asked Johnson if someone had sent her to buy the house, and Johnson replied negatively. At this point, Rowe told Johnson, 'I shall let you have the house, but I do not want any nigger bucks coming in and out of it.'"

The plaintiffs' allegations were also partially corroborated by McRae who described the reasons for Johnson's discharge:

"A Being seen with Harold [Langford]; people coming in and out of her house at strange hours. This type of thing.

"Q Black and white coming into her house?

"A I believe so, although it wasn't put that—

"Q How was it put to you?

"A Traffic in and out of the house at all hours. This type of thing."

Schriever, at trial, denied that the reasons for the dismissal were the plaintiffs' interracial associations. However, he stated that he was not personally familiar with the situation, and that he had relied on complaints by two neighborhood council presidents, Glorioso and Maddox, and Buster McCarley of the Housing Authority. Glorioso and Maddox testified but did not mention Johnson. McCarley did not testify and no evidence was introduced to show he was unavailable.

Langford also produced evidence to show that he had been fired for interracial associations. According to the plaintiffs' account of the meeting with Schriever, the latter had complained that Langford had been seen at Johnson's house. Langford testified that McRae had told him that at a meeting of the Model Cities Board, Glorioso had complained that Langford had been associating in public with Johnson, and Maddox had stated he disapproved of whites and blacks sitting together at public meetings. McRae testified that he had investigated complaints made by Glorioso about Langford and that these complaints were insubstantial. As we have stated, a basis of these complaints, according to McRae, was that Glorioso was opposed to Langford and Johnson associating with each other. Moreover, in determining whether or not Langford was fired for interracial associations, it is relevant to bear in mind the evidence produced by Johnson in regard to her claim.

In addition, evidence was introduced which showed that Langford had been doing a good job at supervision of the Community Organization Department. For example, McRae testified that he had opposed the dismissal of Langford, and felt that the latter was performing satisfactorily. He stated that an independent consulting firm had studied the Model Cities Program and found it to be functioning well. Langford was singled out for special praise.

The defendants also allege that Langford was fired because he refused to dismiss a Community Organizer (Ribble). However, the record indicates that the ultimate power to hire and fire in the Model Cities Program was in McRae's hands, and that he opposed terminating Ribble's employment.

dum opinion, 337 F.Supp. 723. It questioned whether City employees have a constitutional right to associate with persons of all races but assumed, for the purposes of the opinion, that they did. It then stated:

> " * * * While Texarkana is not entitled to be concerned with trying to keep Langford and Mrs. Johnson from associating together as citizens and/or as persons, if the exercise of their right to associate (*if that right exists*) creates such a state of community rejection in the Texarkana area that it destroys or materially and substantially impairs the ability of Langford and Johnson to discharge the duties of their City employment, then Texarkana is required to step in and terminate their employment." (Emphasis added.)

The trial court avoided answering the crucial question of whether Langford and Johnson's interracial associations were a factor in their discharges. Instead, it found that neither was able to gain the confidence of the people with whom they were required to work, that their attitude was one of superior disregard and contempt[7] rather than an attitude of cooperation, and that a true evaluation of the whole picture revealed that each was unable to perform the duties of his or her position.

The problem with these findings is that they left open the question of whether a factor underlying the dismissals was antipathy towards the plaintiffs' interracial associations. This question must be answered because, in our view, the City had no right to discharge Langford and Johnson if interracial associations were a factor in the discharges.[8]

While we could answer the question from the record before us, we decline to do so. It is the trial court's responsibility to do so in the first instance in accordance with the applicable law.

Racially discriminatory state action in employment is unlawful under the Equal Protection Clause of the Fourteenth Amendment.[9] Penalizing a person for the race of his associates is just as racially discriminatory as penalizing a person because of his or her own race. See, Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Dombrowski v. Dowling, 459 F.2d 190, 197, 198, 199 (7th Cir. 1972). See also, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1966); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). In *Adickes,* the complaint alleged that the plaintiff, a white, had been denied the "equal enjoyment of a place of public accommodation by reason of her *association* with Negroes" in violation of 42 U. S.C. § 1983. Adickes v. S. H. Kress & Company, 252 F.Supp. 140, 142 (E.D.N. Y.1966) (Emphasis added.). The Supreme Court agreed that this would, if

---

7. There is nothing in the record to support the court's conclusion that "their attitude was one of superior disregard and contempt," except for the plaintiffs' persistence in continued interracial association.

8. See, Pughsley v. 3750 Lake Shore Drive Cooperative Bldg., 463 F.2d 1055, 1056 (7th Cir. 1972); Green v. McDonnell Douglas Corporation, 463 F.2d 337, 346 (8th Cir.) (Lay, J., concurring), cert. granted, 409 U.S. 1036, 93 S.Ct. 522, 34 L.Ed.2d 485 (1972); Smith v. Sol D. Adler Realty Company, 436 F.2d 344, 349–350 (7th Cir. 1970); Mead and Mount Construction Co. v. N.L.R.B., 411 F.2d 1154 (8th Cir. 1969). See also, London v. Florida Department of Health

and Rehab. Serv., 448 F.2d 655 (5th Cir. 1971) (per curiam), cert. denied, 406 U.S. 929, 92 S.Ct. 1765, 32 L.Ed.2d 121 (1972).

9. In Wieman v. Updegraff, 344 U.S. 183, 191–192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952), the Court stated:
   " * * * [T]he facile generalization that there is no constitutionally protected right to public employment * * * obscure[s] the issue. * * * We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion * * * is patently arbitrary or discriminatory."

true, constitute unlawful racial discrimination, stating:

> " \* \* \* Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race *or the race of his companions,* or in any way act to compel or encourage racial segregation. \* \* \* " (Emphasis added and footnote omitted.)

Adickes v. Kress & Co., *supra* at 398 U. S. 151, at 90 S.Ct. 1605.

▉▉ The fact that interracial associations are frowned on by some in a community cannot serve as a justification to discourage or prohibit such associations by public employees. This is true even if opposition to the interracial associations results in diminishing the effectiveness of the employees. See, Mayers v. Ridley, 151 U.S.App.D.C. 45, 465 F.2d 630, 641 (1972); Baker v. City of St. Petersburg, 400 F.2d 294 (5th Cir. 1968).[10] To hold to the contrary would be to frustrate the exercise of constitutional rights. And this Court and the Supreme Court have rejected the proposition that interference with constitutional rights can be justified on the grounds that the community is hostile to their exercise and vigorously displays its feelings.

For example, in Aaron v. Cooper, 163 F.Supp. 13 (E.D.Ark.1958), the District Court ruled that the integration of the Little Rock School System might be delayed. In reaching its decision, the court took the position that it might properly consider "popular opposition to the plan, resulting in obstructions to its orderly operation." *Id.* at 29. This Court reversed and rejected this view in an opinion by now Chief Judge Matthes. Aaron v. Cooper, 257 F.2d 33 (8th Cir. 1958). The Court recognized that im-

plementation of the integration plan was resulting in community opposition which affected the functioning of the school system:

> "Appalling as the evidence is—the fires, destruction of private and public property, physical abuse, bomb threats, intimidation of school officials, open defiance of the police department of the City of Little Rock by mobs—and the naturally resulting additional expense to the District, disruption of normal educational procedures, and tension, even nervous collapse of the school personnel, we cannot accept the legal conclusions drawn by the District Court from these circumstances. Over and over again, in the testimony, we find the conclusion that the foregoing turmoil, chaos and bedlam directly resulted from the presence of the nine Negro students in Central High School, and from this conclusion, it appears that the District Court found a legal justification for removing temporarily the disturbing influence, i. e., the Negro students. It is more accurate to state that the fires, destruction of property, bomb threats, and other acts of violence, were the direct result of popular *opposition to* the presence of the nine Negro students. \* \* \* "

*Id.* at 39.

It held that despite these facts, the school board must promptly proceed with integration " \* \* \* completely uninfluenced by private and public opinion as to the desirability of desegregation in the community," \* \* \* ". *Id.* at 37 (Emphasis omitted.) The Court was aware that the opposition would create practical difficulties but it, nonetheless, held:

> " ' \* \* \* *The vindication of rights guaranteed by the Constitution can not be conditioned upon the absence of*

---

10. In Baker v. City of St. Petersburg, 400 F.2d 294, 295 (5th Cir. 1968), the facts showed that black police officers were "largely restricted in their duties to policing Negro citizens." The defendant justified this as necessary for efficiency because of the "often delicate and sensitive nature of police work." The Court rejected this argument, stating that " \* \* \* [p]olice efficiency must yield to constitutional rights." *Id.* at 300.

*practical  difficulties.'  * * * "* (Emphasis included and citation omitted.)

*Id.* at 38.

Furthermore, it emphasized that while violence was occurring:

"* * * [T]*he time has not yet come in these United States when an order of a Federal Court must be whittled away, watered down, or shamefully withdrawn in the face of violent and unlawful acts of individual citizens in opposition thereto.*" (Emphasis included.)

*Id.* at 40.

On appeal, the decision of this Court was affirmed by the Supreme Court, stating that "law and order are not here to be preserved by depriving the Negro children of their constitutional rights." Cooper v. Aaron, 358 U.S. 1, 16, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958).

Time and again, the Supreme Court has reiterated the principle that "constitutional rights may not be denied simply because of hostility to their assertion or exercise." Watson v. Memphis, 373 U.S. 526, 535, 83 S.Ct. 1314, 1319, 10 L.Ed.2d 529 (1963).[11]

■ In the light of the trial court's errors of law and its failure to make the necessary factual findings, we have no alternative but to reverse and to remand this matter to the District Court with instructions to it to determine from the record whether the appellants' associations were a factor in the discharge of either or both. If it finds that the associations were a factor, it must reinstate the person discriminated against to the position formerly held by that person or to a position that is comparable in terms of duties, responsibilities and salaries. It must also determine the extent to which each person was damaged and the amount of such damages; the period for which damages may be shown is the period from the date of discharge, November 30, 1970, until the effective date of employment offered the discharged employee. The normal rules of mitigation shall apply in determination of the damages. See, Jackson v. Wheatley Sch. Dist. No. 28 of St. Francis County, Ark., 464 F.2d 411 (8th Cir. 1972).

Costs will be taxed to the appellees and attorneys fees in the sum of $500 are awarded to the appellants for services rendered on this appeal.

11. See, Palmer v. Thompson, 403 U.S. 217, 226, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); Taylor v. Louisiana, 370 U.S. 154, n. 2, 82 S.Ct. 1188, 8 L.Ed.2d 395 (1962); Buchanan v. Warley, 245 U.S. 60, 81, 38 S.Ct. 16, 62 L.Ed. 149 (1971). *Cf.,* Terminiello v. Chicago, 337 U.S. 1, 4–5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); Action v. Gannon, 450 F.2d 1227, 1232 (8th Cir. 1971).