Robert E. **ROBISON**, Plaintiff-
Appellant,

v.

**WICHITA FALLS AND NORTH TEXAS
COMMUNITY ACTION CORPORA-
TION et al., etc., Defendants-Appellees.**

No. 73–3466.

United States Court of Appeals,
Fifth Circuit.

Jan. 15, 1975.

Larry Watts, Houston, Tex., Tom Huckaby, Wichita Falls, Tex., for plaintiff-appellant.

Ray Farabee, Roger A. Lee, H. P. Hodge, Jr., Wichita Falls, Tex., for defendants-appellees.

Before TUTTLE, WISDOM and GEE, Circuit Judges.

WISDOM, Circuit Judge:

Robert Robison, the plaintiff-appellant in this employment termination case, raises two issues on appeal. First, he challenges the constitutionality of the procedures employed by the Wichita Falls and North Texas Community Action Corporation ("Wichita") in terminating his employment as a program director because of his having allegedly misappropriated corporate funds. Second, he challenges the refusal of the United States District Court to hear evidence that his termination was in retaliation for the exercise of his First Amendment rights. We find no merit to these arguments. We affirm.

## I.

Wichita is a nonprofit corporation organized under Texas law as an anti-poverty organization to qualify for Federal government funding under the Economic Opportunity Act of 1964, 42 U.S.C. § 2781 et seq. It is part of a national network of local community action groups designed by Congress to provide "a better focusing of all available local, State, private, and Federal resources upon the goal of enabling low-income families, and low-income individuals of all ages . . . to attain the skills, knowledge, and motivations and secure the opportunities needed for them to become fully self-sufficient." 42 U.S.C. § 2781(a). These local community action groups may take the form of either (1) an agency of a state or political subdivision, administering its program through a community action board or (2) a public or private non-profit agency administered by its own governing board. 42 U.S.C. § 2791(a). See also PAAC v. Rizzo, E.D.Pa.1973, 363 F.Supp. 503, 507.

Wichita is a Texas non-profit corporation governed by a board of directors divided into three classes, each representing an interest group or constituency in the community. One-third of the directors are public officials of the political subdivisions comprising Wichita's serv-

ice area. The second third of the directors are chosen from the poor in the group's service area. The final third represent various interest groups in the community, such as business, labor, education, medicine, and religion.

Robert Robison went to work for Wichita in July 1966. He was the second employee to be hired by the corporation and was initially employed as its field representative in Archer City, one of the towns within its service area. Robison later became project director of Operation Mainstream, a training program supervised by the United States Department of Labor that places the unemployed in training positions with local government agencies and non-profit organizations. As director of Operation Mainstream, Robison travelled extensively through the service area by automobile. He used his own vehicle and was reimbursed by Wichita on the basis of his mileage.

On July 23, 1970, the corporation placed Robison on probation for sixty days because of an alleged lack of leadership and direction in his program. Thereafter, on July 31, Wichita's executive director notified Robison in writing that his employment was being terminated because he had submitted fraudulent travel vouchers. The director also informed Robison of his rights, under the Wichita by-laws, to submit a formal written appeal to the corporation's grievance committee and, if necessary, to make a further formal appeal to its executive committee.

Robison appealed to the grievance committee within the permitted time. On August 6, the executive director transmitted to the grievance committee a detailed written explanation of his reasons for terminating Robison's employment and statements of witnesses in support of the director's action. Robison was furnished with copies of this material. On August 10 he submitted to the grievance committee a detailed written answer along with statements by his supporting witnesses. The grievance committee affirmed the director's decision on August 12 and advised Robison of his further right to appeal to the executive committee.

On August 20, eight members of the twelve-member executive committee met to consider Robison's appeal. Robison presented his side of the dispute at this hearing and he was examined by members of the committee. On August 21 the executive committee affirmed the decisions of the director and the grievance committee and removed Robison from the payroll.

Almost two years later, on July 28, 1972, Robison brought this civil rights action against Wichita and various individual directors and employees of the corporation. He alleges that he was deprived of rights secured by the First and Fourteenth Amendments to the United States Constitution because he was not afforded a trial-type hearing before an impartial panel and because the termination of his employment was in retaliation for the exercise of his right of free speech. Robison's action is brought under Section One of the Civil Rights Act of 1871, 42 U.S.C. § 1983. Jurisdiction is alleged to exist under 28 U.S.C. §§ 1343(3), 1343(4) and 1331. Robison seeks relief that includes an order of re-instatement in the same or a similar position, compensatory and exemplary damages totalling $150,000, reasonable and necessary attorneys' fees, and a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that the acts of the defendants were in violation of the Constitution and laws of the United States.

The cause was tried to the court sitting without a jury and judgment was entered in favor of the defendants.

## II.

The first question we must consider is whether Robison has stated a claim over which federal courts have jurisdiction. Although the question was not briefed,

counsel for the parties extensively discussed the issue of federal jurisdiction in oral argument.

In considering jurisdiction, we are met at the outset with this Court's decision in Hines v. Cenla Community Action Committee, Inc., 5 Cir. 1973, 474 F. 2d 1052. In that case, Erma Hines was discharged from her position as Executive Director of the Cenla Community Action Committee. She brought a federal action alleging that she was arbitrarily and capriciously terminated without cause in violation of her rights under the Economic Opportunity Act, 42 U.S.C. § 2796(a). She alleged federal jurisdiction under 28 U.S.C. § 1331.

Section 2796(a) of Title 42 requires that each local community action agency observe administrative standards and personnel policies consistent with "the objective of providing assistance effectively, efficiently, and free of any taint of partisan political bias or personal or family favoritism". Each agency is required to promulgate rules with respect to employee benefits, salaries, and promotion policies.

The purpose of Section 2796(a) is to state uniform standards of administrative practice that must be met by local community action groups in order to qualify for federal support. In Hines, the court held that Section 2796(a) merely outlines the responsibility of local groups to the federal government; it confers no benefits directly on individual employees of local groups. Thus an injury resulting from a local group's noncompliance with the standards required by Section 2796(a) will not give rise to a cause of action based exclusively on that section.

■ In order to assert federal jurisdiction under 28 U.S.C. § 1331, the plaintiff's claim must be founded directly upon federal law. "To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." Gully v. First National Bank in Meridian, 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70. The Hines Court held that there was no Section 1331 jurisdiction because "the statute which the plaintiff seeks to invoke creates no explicit right of action to enforce her right to employment." 474 F. 2d 1052, 1056. In light of Hines, Robert Robison's assertion of federal jurisdiction under 28 U.S.C. § 1331 is misguided.

Unlike Erma Hines, however, Robert Robison does not attempt to extract a cause of action from the Economic Opportunity Act itself and he does not rely solely on Section 1331 as a jurisdictional basis. Robison alleges that his claim states a cause of action under 42 U.S.C. § 1983 and alleges jurisdiction under 28 U.S.C. § 1343(3) and § 1343(4) as well as under § 1331.

■■ Section 1983 provides a cause of action for persons deprived of their federal civil rights. To state a claim under Section 1983, the deprivation must be accomplished under color of state "statute, ordinance, regulation, custom, or usage". 42 U.S.C. § 1983. Violations of federal civil rights by federal officers, for instance, will not give rise to a cause of action under Section 1983. See District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed. 2d 613 (1973). An essential element in a section 1983 action is that the injury underlying the claim be the product, in some sense, of activity by state officials.

Nowhere in his complaint does Robert Robison specifically allege that Wichita or its employees or directors acted under color of state law. Indeed, his allegation that Wichita is a "federally financed and funded corporation" would suggest, if anything, that Wichita's governmental nexus is with the federal government rather than the state. On the other hand, Robison does assert a cause of action under Section 1983, and that cause of action requires state rather than federal action as an essential element. Moreover, the trial court found that

Wichita did act under color of state law when it terminated Robison.

 Noting that Robison sued under Section 1983, taking the complaint as a whole, and considering the nature of the evidence adduced at trial as well as the trial court's findings, we construe the complaint as charging that Wichita and its employees and directors deprived him of his civil rights under color of state law. We take Robison's allegation that Wichita is a "federally financed and funded corporation" to be merely a second and thoroughly useless string to his counsel's bow.

The standard we must apply is that set out in Robles v. El Paso Community Action Agency, 5 Cir. 1972, 456 F.2d 189. In *Robles*, a discharged employee of a similar community action group brought suit in federal court to challenge her discharge without a prior hearing. The district court dismissed her complaint for lack of jurisdiction. This Court affirmed the dismissal solely on the ground that Mrs. Robles's complaint failed to state a claim because she was a temporary, nontenured employee without any statutory right to be employed or continued in employment. On the issue of jurisdiction, however, the Court held that "there was jurisdiction under 28 U.S.C. § 1343(3) because Mrs. Robles did claim a deprivation of a constitutional right under color of state law." 456 F.2d 189, 191 (1972). For the reasons stated in *Robles*, we find jurisdiction here under Section 1343.

### III.

Robison's principal arguments are that Wichita's discharge procedures did not comply with minimum requirements of due process and that the trial court erred in refusing to hear evidence that he was discharged in retaliation for the exercise of his First Amendment rights. Both these arguments have vitality only if Wichita is a public employer.

Wichita argues that Robison's allegations are without merit because this Court has held that a community action group incorporated under state law as a private non-profit corporation is a private employer. Hines v. Cenla Community Action Committee, Inc., 5 Cir. 1973, 474 F.2d 1052. We do not agree that such a broad proposition may be extracted from *Hines*.

Only at first blush can *Hines* be said to dispose of the question whether Wichita is a state agency. In *Hines,* the plaintiffs did not allege that the defendants acted under color of state law. Although the Court said that Cenla was a "private" corporation, the sole issue in the case was whether there was sufficient federal involvement to make the community action group an arm of the federal government. The court resolved this issue by holding that the corporation "did not become a public corporation *merely* because it received federal funds". 474 F.2d 1052, 1057 (emphasis added). Because it "was not a public corporation controlled by the federal government, the plaintiff could not be a federal employee". 474 F.2d 1052, 1058.

Although Hines attempted to state a claim under the Fourteenth Amendment, it was not seriously argued that the community action group was a *state* agency; indeed, the whole thrust of the plaintiff's attack was that the group was an arm of the federal government. Thus the court easily disposed of the Fourteenth Amendment issue on almost the basis of a stipulation:

> Since the plaintiff in the present case was not employed by the state and there was no state involvement in her employment, procedural safeguards guaranteed by the Fourteenth Amendment did not apply to her private contractual employment. 474 F.2d 1052, 1058.

Against this background the court's statement that the community action corporation was a private corporation must be considered necessary to the decision only insofar as it means that the

agency was not an agency of the federal government.

■ In any event, it would be wrong to read *Hines* as holding that the federal courts must consider *all* community action organizations organized as private non-profit corporations under state law to be private corporations for purposes of determining whether those corporations have acted under color of state law. Although a state may authoritatively determine that an association is a private association for purposes of state law, such a determination will not limit the federal courts in determining whether there has been a violation of the Fourteenth Amendment. It is the reality of the association's purpose, organization and activities and not the appellation the state gives it that determines the applicability of the Fourteenth Amendment. Any alternative standard would eviscerate constitutional protections.

In providing for community action groups, Congress intended to allow maximum organizational flexibility so that local groups could best take advantage of local resources and best fill local needs. The House Report on the 1967 Amendments to the Economic Opportunity Act indicates that Congress intended to provide for a variety of organization types:

> There is no single entity to which one can refer as the model for a Community Action agency. As the term implies, a Community Action agency is the creature of local invention and innovation. Programs are fashioned to cope with the problems of poverty as they exist locally, and objectives vary from community to community. 1967 U.S.Code, Cong. and Admin.News, p. 2447.

Congress provided that community action programs could take the form of public or private non-profit corporations or agencies of state and local governments. Given this diversity of form, we construe the Court's holding in *Hines* to mean that the particular association involved in that case was a private corporation and not that all community action groups are categorically private corporations for purposes of the Fourteenth Amendment and Section 1983.

■ In this particular case, we need not reach the issue whether Wichita is in fact a public organization. We hold that even if it is a public corporation acting under color of state law, the procedures it followed in discharging Robison meet the minimum requirements of due process and the trial court did not err in refusing to hear evidence on Robison's First Amendment claim.

## IV.

For purposes of this appeal, we may assume without deciding that Wichita is in fact a public body subject to Fourteenth Amendment standards. We must now decide whether the procedures Wichita employed in discharging Robison conform with minimum requirements of due process.

■ Employees discharged from public employment are not categorically entitled to a pre-termination hearing. A hearing is constitutionally required, however, when the stated reason for a public employee's discharge is an allegation that he is guilty of immoral or dishonest conduct or other behavior that might tend to stigmatize him or to lower his standing in the eyes of the community. Birnbaum v. Tussell, 2 Cir. 1966, 371 F.2d 672. An employee who is discharged because of allegedly dishonest conduct has an interest in his reputation as well as in continued employment. These two interests must be distinguished for purposes of the hearing requirement. The Supreme Court stated the relevant standard in Board of Regents of State Colleges v. Roth, 1972,

408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548:

"[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is *doing to him, notice and an opportunity to be heard are essential.*"

A non-tenured employee who has no expectation of continued employment may not be entitled to a hearing merely for the sake of retaining his employment, but he will be entitled to a hearing for the narrow purpose of vindicating his reputation. As the Supreme Court has said, "The purpose of such notice and hearing is to provide the person with an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other purposes". Board of Regents of State Colleges v. Roth, 1972, 408 U.S. 564, 573, fn 12, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548.

 Wichita accused Robison of submitting false travel vouchers for reimbursement of non-existent expenses. This allegation of dishonesty falls squarely within the Court's language in *Roth* since it would have an adverse effect both on his reputation and on opportunities for future employment. If Wichita is in fact a public body, Robison was clearly entitled to a hearing for the purpose of rehabilitating his reputation in the face of these allegations of dishonesty.

 The type of hearing required to satisfy the standards of due process varies according to the facts of a situation. Due process itself is not a technical conception with a fixed content unrelated to time, place, and circumstances; it is a general requirement that legal processes follow the forms of law, be appropriate to the case, and be just to the parties affected. Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 71 S.Ct. 6024, 95 L.Ed. 817. Procedural due process does not require all the safeguards of a criminal trial and it does not require a trial-type hearing in every conceivable case of government impairment of private interests. Cafeteria and Restaurant Workers v. McElroy, 1961, 367 U.S. 886, 894, 81 S.Ct. 1743, 6 L. Ed.2d 1230.

 Robison alleges that he was denied due process in that Wichita failed to advise him in sufficient detail of the reasons for his discharge. He alleges no specific insufficiencies. The record demonstrates that Wichita notified Robison on July 31 that he was being discharged specifically because he had submitted fraudulent travel vouchers. In the circumstances of this case, we think that this statement of reasons was sufficient to give Robison adequate notice.

 Robison next alleges that he was not advised of the names of adverse witnesses or of the nature of their testimony. This allegation misconceives the character of the proceedings at which Wichita's grievance committee made its unfavorable determination.

The grievance committee made its determination on the basis of written statements submitted by Robison, by witnesses supporting Robison, by Wichita's executive director, and by witnesses supporting the executive director. The decision was made on the basis of this paper record. Wichita provided Robison with copies of the adverse statements on August 6 and he replied to them with his own statement and those of his witnesses on August 10. We find no evidence of "faceless informers" in this case and no merit to his claim of inadequate notice as to the identity and the testimony of adverse witnesses. See K. Davis, Administrative Law Treatise § 7.05 (1958).

 Robison's next allegation states that he was not accorded a meaningful opportunity to be heard by a tribunal "that possessed some academic expertise and had an apparent impartiality toward

the charges". The record shows that Wichita provided Robison with an opportunity to present his case in writing before two appeals bodies and to state his case orally before one of them. He was given sufficient time to prepare for all of these submissions and we cannot say that such an opportunity to be heard was mere ceremonial compliance with the requirements of the Fourteenth Amendment.

Robison states in his brief that the tribunal must possess "academic expertise". He does not explain the origin or meaning of this requirement. It appears, however, that he extracts it from Ferguson v. Thomas, 5 Cir. 1970, 430 F. 2d 852. The requirement of "academic expertise" may seem, out-of-context, to suggest a principle that the deciding authority be trained in law or labor relations or some other applicable academic discipline. That is not the case. In *Ferguson*, a university professor was discharged. He questioned the type of hearing due process requires. The Court declared that he was entitled to a hearing by a tribunal possessing "academic expertise", meaning, presumably, proficiency in some area or areas of university study. Since Professor Ferguson was discharged because of his alleged academic deficiencies, he was entitled to a hearing by a board suited by training and experience to evaluate his academic performance. Academic expertise is irrelevant in Robison's case. He was not discharged for deficiency in any academic field; he was not entitled therefore, to be evaluated by a panel of educators with "academic expertise".

 We have carefully reviewed the entire record. Wichita is a small organization and, not unlike other organizations, is subject to personality clashes, disagreements over policy, and factions among the directors and staff. Some of the people connected with Wichita were admirers of Robison, others were not. One of Wichita's directors had an extremely low opinion of Robison and his work. Corporate officials designated to serve as judges or arbitrators know the parties whose interests are at stake and are bound to form some judgment regarding their character and competence as well as the needs and policies of the organization. Just as a determination of bias does not follow from the fact that a hearing examiner or trial judge may entertain an unfavorable opinion of a party as a result of evidence received in a prior or connected hearing, a determination of bias will not follow from the mere fact that an arbitrator or deciding authority has prior and independent knowledge of the dispute. See McKay v. McAlexander, 9 Cir. 1959, 268 F.2d 35, 39. See also K. Davis, Administrative Law Treatise § 12.01 (1970 Supp.). Absent some showing of *actual* interest or partiality, we must find no denial of due process. If the courts were to find otherwise, no small public agency would be able to settle its own disputes.

Robison alleged that he was denied due process because he was not given sufficient details of the reasons for his termination and of the testimony against him and that he was not accorded a meaningful opportunity to be heard before "a tribunal that both possessed some academic expertise and had an apparent impartiality toward the charges". These allegations merely track a statement of due process requirements applicable to disputes involving university professors, as set out in Ferguson v. Thomas, 5 Cir. 1970, 430 F.2d 852. Robison makes no effort to relate those standards to the facts of his case.

 The process sufficient to satisfy the due process requirement depends on the facts and circumstances of an individual case and not on figures of speech imported from other cases. Robison makes no attempt at relating the facts of his case to the statement in *Ferguson* but merely asserts that he was

denied due process. We find that Wichita's procedures conformed to the applicable requirements of due process.

## V.

▆ We turn now to whether the district court erred in refusing to consider evidence offered to prove that Robison's discharge was in retaliation for his exercise of First Amendment rights. The trial court refused to hear evidence on the First Amendment issue, but found that Robison's termination "was based solely on his submission of fraudulent travel vouchers and was not violative of his First Amendment rights". Although this finding might have been stated more elegantly in light of the court's narrowing of the issues, we take it to mean only that there was sufficient evidence of Robison's submission of fraudulent travel vouchers to justify his discharge.

Robison contends that he is entitled to relief because a discharge is invalid if it is based even partially on constitutionally protected activities. Apparently he believes that even an undisputed embezzler would be entitled to damages and re-instatement if any link whatsoever could be established between his exercise of First Amendment rights and the discharge. As authority for that proposition, he cites Langford v. City of Texarkana, 8 Cir. 1973, 478 F.2d 262. In *Langford,* three public employees were discharged without a statement of reasons, notice, or hearing. The two employees who challenged the dismissals alleged that their dismissals resulted from the city's disapproval of their associations with persons of other races. The court held that if the district court "finds that the associations were *a factor*, it must reinstate the person discriminated against to the position formerly held by that person or to a position that is comparable in terms of duties, responsibilities and salaries." 478 F.2d 262, 268 (emphasis supplied).

The discharge in *Langford* presents a different case from Robison's because it was accomplished without a statement of reasons, notice, or hearing. Moreover, we do not find support for Robison's position in the court's language in *Langford* since we understand the expression "a factor" to mean "a necessary factor" or a factor without which the discharge decision may not be justified. When constitutionally neutral reasons are themselves sufficient to uphold the deciding authority's judgment and there is no allegation of discrimination in the sense of holding a discharged employee to a tougher standard than that used to measure the performance of his peers, we see no benefit to be gained from hearing evidence on the constitutional claim. Otherwise we would be placed in the anomalous position of ordering the reinstatement of an unsuitable employee merely because he has exercised his freedom of speech.

We have previously considered this problem in Fluker v. Alabama State Board of Education, 5 Cir. 1971, 441 F.2d 201. In *Fluker*, the employment of two non-tenured faculty members at Alabama State University was terminated when their teaching contracts were not renewed. The University explained that the contracts were not renewed because the two faculty members did not have doctorates and the University had embarked on a policy directed at increasing the number of faculty members holding that qualification. The University had also decided to make room for candidates with doctoral degrees by terminating the most junior members of the faculty. The plaintiffs were junior members of their respective departments.

The plaintiffs in *Fluker* maintained that the University had terminated their employment because they had criticized the University administration and had been actively involved in an episode of campus unrest and agitation in May

1969. As the district court observed, "[t]hey seem to contend that this gives them some insulation from being selected for termination". (Cited in 441 F.2d 201, 205). The relevant principle, as stated by Judge Thornberry in *Fluker*, is as follows:

When the violation of substantive constitutional rights has been charged, however, to the extent that the absence of factual support for the stated reasons for the University's action tends to prove that some other constitutionally impermissible reason underlies the action, the courts should examine the credibility of the University's stated reasons . . . Thus, in the instant case, if the appellants could demonstrate that there was no factual basis for the University's action, this would tend to prove that other, constitutionally impermissible reasons motivated the University's action. On the other hand, even if the facts do support the stated reason for the University's action, the appellant would still not be precluded from demonstrating that constitutionally impermissible purposes were also involved. 441 F.2d 201, 209.

Section 1983 plaintiffs do not have *carte blanche* rights to present evidence of a First Amendment violation in every employment discharge case. The first step in such a case must be an inquiry into the sufficiency of the employer's stated reasons for terminating the employee. Three different situations may exist. First, no reasons may be stated or the stated reasons for terminating the employee may be clearly insubstantial. In that case, the absence or insubstantiality of the stated reasons adds weight to the allegation that the discharge resulted from constitutionally impermissible reasons and the court must reach the constitutional claims. Second, where the facts do tend to support the employer's stated reasons, the plaintiffs would not necessarily be precluded from

demonstrating that constitutionally impermissible purposes were also a necessary factor in the termination decision. In such a case, "[w]e recognize that a justifiable ground of discharge is not a defense when that ground is a *mere pretext* and not the moving cause of the discharge". Cook County College Teachers Union, Local.1600 v. Byrd, 7 Cir. 1972, 456 F.2d 882, 888. Where the stated reasons are substantial but not sufficient by themselves to justify the discharge, the constitutionally impermissible reason would be a necessary factor on which the court must hear evidence. The third possible situation is where the organization's stated reasons constitute a sufficient as well as a substantial basis for the decision. Where there is no allegation of unequal treatment or selective enforcement and where the stated reason is itself sufficient to justify the discharge, we see nothing to be gained from hearing evidence on the First Amendment claim. Robison's case falls squarely within this final category.

Robison directs our attention to a number of cases in which courts have held that evidence must be heard on the First Amendment claim in an employment discharge case. These cases are not in point, because they are cases where the stated reasons for the discharge were either insubstantial or substantial but insufficient by themselves to support the discharge. With Robison we do not have a case where the employee had a clean record apart from the disputed exercise of his First Amendment rights. Gierginer v. Center School District No. 58, 8 Cir. 1973, 477 F.2d 1164. Nor do we have a case that comes to us from summary judgment. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1970). In Robison's case, the district court heard evidence on allegations that were both substantial and sufficient by themselves barring discriminatory enforcement of standards, to justify Robison's dis-

charge. We cannot say that the district court erred in limiting the proof as it did.

Just as the First Amendment cannot limit the public's power to dismiss the inept, it also cannot limit the public's power to dismiss the corrupt. As the Second Circuit has said, "Public employment is not a sinecure to be retained regardless of merit simply by shouting loudly that any threat of dismissal is motivated by an anti-First Amendment animus". Russo v. Central School District No. 1, 2 Cir. 1972, 469 F.2d 623.

The decision of the district court is affirmed.

GEE, Circuit Judge (specially concurring).

Being in less than entire agreement with the Court's treatment of the decision in *Hines*,[1] I find myself unable to join in Parts II and III of the majority opinion. I concur, however, in Parts I, IV and V thereof and in the result.

1. Hines v. Cenla Community Action Committee, Inc., 474 F.2d 1052, 5 Cir. 1973.